Agin Hameen FURQAN, a/k/a Willie X. Ross, Plaintiff,

v.

**GEORGIA STATE BOARD OF OFFENDER REHABILITATION, et al., Defendants.**

Civ. A. No. C81–685A.

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 30, 1982.

Ralph Goldberg, Atlanta, Ga., for plaintiff.

Harrison Kohler, Charles E. Brown, Atlanta, Ga., for defendants.

## ORDER

FORRESTER, District Judge.

Before the court is plaintiff's motion for a preliminary injunction to enjoin defendants from enforcing a prison regulation which would require plaintiff to shave his beard. A hearing was held on this matter on September 30, 1982, where this court announced that the hearing on the preliminary injunction shall be consolidated with the trial on the merits pursuant to Fed.R. Civ.P. 65(a)(2). This opinion contains certain relevant findings of fact pursuant to Fed.R.Civ.P. 52(a). These supplement or restate findings announced orally at the conclusion of the trial and should be read in conjunction with the oral findings.

## I. FACTUAL BACKGROUND AND CONTENTIONS

Department of Offender Rehabilitation Regulation 125–2–8–.04(6) requires inmates to have periodic haircuts and disallows inmates from having long hair or any beards. Plaintiff is incarcerated at the Georgia Diagnostic and Classification Center in Jackson, Georgia, and is on death row. He was convicted for murder, armed robbery, and kidnapping. Plaintiff presently has a beard of about one-quarter of an inch, which is being allowed solely to prevent aggravation of his medical condition, entitled pseudo folliculitis barbe. Plaintiff has a hair length of about three inches and wears his hair in an Afro style.

Plaintiff alleges that he is a Sunni Muslim [1] and desires to grow a beard of about two or three inches. He contends that the growing of the beard is a practice of his Islamic faith. This belief is derived from his interpretation of three passages from the Koran and from the footnotes to an annotated edition of the Koran.[2] He repre-

---

1. Plaintiff testified that he became a Muslim on December 20, 1973, which is after the committed crimes for which he was convicted. He further testified that he became a Muslim by reading literature and listening to other inmates who profess the Muslim faith.

2. Plaintiff testified that his reading of the Koran revealed that there is a physical and spiritual meaning to the growing of a beard. He represents that inasmuch as he is a creature of God, a defacing of himself is impure. Furthermore, he advances the belief that inasmuch as all religious prophets have beards, beards show the grace of God. Therefore, he advances his

sents that his present beard is not sufficiently free flowing to satisfy his religious beliefs.

Plaintiff, in support of his claim that the regulation violates his constitutional rights, provides a three-prong argument. First, he asserts that judicial deference has its limits in a first amendment context such that legitimate custodial objectives must be articulated in support of the regulation. Further, plaintiff states that judicial inquiry is required to determine whether these objectives could be achieved by reasonably narrower means and contends that no evidence was presented that forbidding beards is the least restrictive means. Second, plaintiff argues that the determination of when a beard is a beard has to be left to the individual. As plaintiff states, "it's up to plaintiff to draw the line and it is not for this Court to say that the line he would draw is an unreasonable one." Post Hearing Brief, at 3. Plaintiff illustrates by pointing to the policy statement of the Federal Bureau of Prisons.[3] He further submits that what he now wears cannot be described as a full beard for purposes of his expression of his religious beliefs. Third, plaintiff maintains that first amendment protection is warranted to an individual's sincere religious belief irrespective of whether that belief is a tenet of the religious sect. He argues that "[t]he fact that plaintiff might not be a most

learned adherent of Islam, hardly affects his sincerity. If so, religious freedom would belong only to the adequately educated." *Id.*

In response, defendants argue that plaintiff has failed to show by a preponderance of the evidence that his desire to wear a beard is based on a sincere religious belief. Defendants argue that since plaintiff's desire is based on an interpretation from passages of the Koran and not on a Sunni tradition, plaintiff has failed to carry his burden of proving sincerity. In addition, defendants contend that the proper standard for evaluating the justifications for the regulation in question is a "reasonable basis" test and not a "least restrictive means" test. Further, they suggest that a balancing test, whether particular or general, is inappropriate. Finally, defendants argue that the state regulation is rationally related to three legitimate and central state interests: (i) The security of Georgia's penal institutions, inasmuch as beards and long hair can be used to conceal contraband as well as to alter appearance, (ii) discipline, and (iii) the health of inmates.

Plaintiff's claims for injunctive relief raise two issues: (a) Whether plaintiff is sincere in his religious beliefs, and (b) whether the state regulation against beards can be justified under constitutional stan-

---

feeling that he is wounded in a religious sense by his not wearing a beard to the length which he desires.

**3.** In a Program Statement of the United States Department of Justice, Federal Prison System, effective August 1, 1979, the following is provided:

1. [POLICY § 551.1. The Bureau of Prisons permits an inmate to select the hair style of personal choice, and expects personal cleanliness and dress in keeping with standards of good grooming and the security, good order, and discipline of the institution.] This Program Statement retains the requirement of cleanliness and good grooming. This requires that hair be clean and neat, inmates be clean shaven in facial areas where mustaches or beards are not worn, and regular bathing must be maintained.

. . . .

3. [MUSTACHES AND BEARDS § 551.2. An inmate may wear a mustache or beard or both. The Warden may require an inmate

with a beard to wear a beard covering when working in food service or where a beard could result in increased likelihood of work injury.
4. HAIRPIECES § 551.3.
a. A female inmate may wear a wig or hairpiece.
b. A male inmate may not wear an artificial hairpiece.
5. HAIR LENGTH § 551.4.
a. The Warden may not restrict hair length if the inmate keeps it neat and clean.] An inmate may have a shaved head or long hair, including an Afro.
[b. The Warden shall require an inmate with long hair to wear a cap or hair net when working in food service or where long hair could result in increased likelihood of work injury.]
*See* 28 C.F.R. § 551.1–6.

dards. In *Shabazz v. Barnauskas,* 598 F.2d 345 (5th Cir.1979), in which a prison inmate claimed that a Florida prison regulation against beards infringed his right to practice his Islamic religious faith, the Fifth Circuit remanded for "a hearing inquiring into plaintiff's alleged sincerely held religious beliefs and into the state's justifications for its regulations." *Id.* at 347. The court distinguished earlier cases "involving religious claims so facially idiosyncratic that neither a hearing nor justification by the state for its rule was required." *Id.* Defendants here do not contend that plaintiff's claims that he is a Sunni Muslim and that he is required by his faith to wear a beard are facially idiosyncratic within the meaning of *Shabazz.*

## II. SINCERITY

■ In order to determine whether plaintiff was sincere for the purposes of pursuing his claim that this regulation is constitutionally invalid, plaintiff must initially demonstrate that the practice of wearing a beard is deeply rooted in the religious belief of the Sunni Muslims. Although proof is not required that the growing of a beard is an absolute tenet of the Sunni Muslims, *see Teterud v. Burns,* 522 F.2d 357, 360 (8th Cir.1975), some quantum of proof is required to show that the practice of growing a beard is a practice protected from governmental regulation by the free exercise clause. *See Wisconsin v. Yoder,* 406 U.S. 205, 216, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *Welsh v. United States,* 398 U.S. 333, 343, 90 S.Ct. 1792, 1798, 26 L.Ed.2d 308 (1970). Here, such a demonstration has been provided. Iman Abdul Sabree, a minister of the American Muslim Mission, testified that the growing of a beard is not an absolute requirement of the Sunni sect, but is strongly recommended. Furthermore, he testified that a believer can reasonably conclude that there may be spiritual benefits from growing a beard, thus emulating the Prophet Mohammed. Accordingly, this court finds that the growing of a beard is deeply rooted in the religious tradition of plaintiff's faith.

Furthermore, plaintiff must affirmatively establish that he was sincere in his religious beliefs. *Shabazz v. Barnauskas, supra.* Plaintiff testified that he reads the Koran daily, follows fundamental tenets of fasting, prayer, and chastity, and prays five times per day. Defendants argue that plaintiff is insincere since his desire to have a beard is not based on a Sunni tradition, but rather on three passages from the Koran and on footnotes to an annotated edition of the Koran. Post Hearing Brief of Defendants, at 8–9. This record, however, is void of any extrinsic evidence of patterns of inconsistent statements or actions.[4] Furthermore, it is not the function of the court to determine religious orthodoxy. *Fowler v. Rhode Island,* 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953). Assuming *arguendo* that an objective criteria can be delineated to evaluate the reasonableness of plaintiff's interpretations of the Koran, this record fails to indicate that plaintiff's desire to grow a beard was not derived from a genuine motivation to express symbolically his "ultimate concern".[5] Accordingly, this court finds that plaintiff is sincere in his adherence to the Sunni Muslim faith.

In summary, this court concludes that this plaintiff is sincere in his religious beliefs so as to have a personal stake in the outcome of the controversy. *See Moskowitz v. Wilkinson,* 432 F.Supp. 947, 949–50 (D.Conn.1977).

## III. STANDARD OF REVIEW

Several courts have adopted a "least restrictive means" standard of review for

**4.** *See* Note, Toward a Constitutional Definition of Religion, 91 Harv.L.Rev. 1056, 1081–82 (1978).

**5.** Note, *supra* note 4, at 1066–67 (commentator notes that the Supreme Court in *United States v. Seeger,* 380 U.S. 163, 187, 85 S.Ct. 850, 864, 13 L.Ed.2d 733 (1965), explicitly relied upon the phenomenological definition of religion as artic-

ulated by theologian Paul Tillich). For a listing of the cases and commentators which have formulated a broad non-theistic approach to a constitutional definition of religion, see *Africa v. Commonwealth of Pennsylvania,* 662 F.2d 1025, 1032 n. 12 (3d Cir.1981), *cert. denied,* 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982).

evaluating prison regulations. In utilizing this standard, the central inquiry becomes whether the regulation is overly broad.[6] For example, in *Gallahan v. Hollyfield,* 670 F.2d 1345 (4th Cir.1982), the Fourth Circuit held that a prison haircut regulation was unconstitutional because it restricted an inmate's right to exercise freely his sincere religious beliefs. The court determined that the proffered justifications for the regulation were either overly broad or lacking in substance, and even if the justifications were legitimate, they were not warranted because less restrictive alternatives were available. For instance, the court suggested that the prison authorities could make the inmate wear his hair in a pony tail to prevent him from using it as a mask. In addition, the court suggested that the authorities are not enjoined from searching his hair for contraband or requiring him to keep it neat and clean. Similarly, in *Teterud v. Burns, supra,* the Eighth Circuit affirmed the decision of a district court which held that justifications regarding an absolute prohibition against wearing long hair were either without substance or overly broad in their sweep since: (1) The interests in sanitation and safety could be adequately served by requiring those with long hair to wear hair nets; (2) those inmates whose appearance changes by growing long hair could be rephotographed for easy identification; (3) any contraband secreted in the longer hair would be found by the normal body searches; and (4) there was no reason to believe that an inmate could not keep long hair clean. *Id.* at 361. Again, in *Burgin v. Henderson,* 536 F.2d 501 (2d Cir. 1976), where a complaint by Sunni Muslims alleged that prison correctional authorities have interfered with their free exercise of religion by preventing them from wearing beards or prayer caps, or praying in the manner prescribed by their religion, the Second Circuit stated the following:

> But even if the institutional purpose is legitimate and substantial "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."

*Id.* at 504 (quoting *Sostre v. Preiser,* 519 F.2d 763, 764 (2d Cir.1975)).

The *Burgin* court, however, also embraced the concept of a balancing of interests standard. 536 F.2d at 504. ("But if a factual record is necessary to decide whether the state's interest in hygiene and identification outweighs the prisoner's interest in growing a beard as required by his religion, the same treatment is required to determine whether a ruling barring all hats—of whatever size, style, or religious significance—is necessary to prevent hiding weapons.") Such a conceptual posture or standard was adopted in *Dreibelbis v. Marks,* 675 F.2d 579 (3d Cir.1982). In *Dreibelbis,* an inmate who alleged that the laws of his faith prohibit him from cutting hair from any part of his body challenged a prison regulation which prescribes hair grooming standards. Subsequent to the inmate's complaint being referred to a Magistrate and a conclusion by the Magistrate that the action was frivolous, the district court observed that the unreasonableness or unfairness of the regulation has not been demonstrated and proceeded to dismiss the action without service of process. The Third Circuit reversed and remanded, stating "that the existence of a complete factual record is critical to the task of striking a balance between the two competing interests in this case." *Id.* at 581. Significantly, the court stated that the issue subsequent to the determination of whether the plaintiff is sincere is "whether a legitimate and reasonable exercised state interest outweighs the proffered first amendment claim." *Id.* at 582 (quoting *Africa v. Commonwealth of Pennsylvania,* 662 F.2d 1025, 1030 (3d Cir. 1981)). Furthermore, Justice Marshall has proposed such a balancing analytical framework. *Bell v. Wolfish,* 441 U.S. 520, 569–71, 99 S.Ct. 1861, 1889–90, 60 L.Ed.2d 447 (1979) (Marshall, J., dissenting).

**6.** Let A, B, and C stand for available means for serving a legitimate state interest which are progressively less restrictive. (A is most restrictive.) B would fail the least restrictive means test because, although it is less restrictive than A, it is more restrictive than C.

Nevertheless, this court believes that the Supreme Court has spoken on this issue and has embraced a "rational basis" standard. In *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), a prisoners' labor union brought an action under 42 U.S.C. § 1983 claiming that its first amendment and equal protection rights were violated by regulations that prohibited prisoners from soliciting other inmates to join the Union and barred Union meetings and bulk mailings concerning the Union from outside sources. The Supreme Court held that the regulations were not violative of the Constitution. Initially, the Court noted that "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Id.* at 125, 97 S.Ct. at 2537–38. Similarly, the Court noted that since "the realities of running a penal institution are complex and difficult, we have also recognized the wide-ranging deference to be accorded the decisions of prison administrators." *Id.* at 126, 97 S.Ct. at 2538. Significantly, the Supreme Court, through Justice Rehnquist, utilized "reasonableness" language at least six times in its decision:

1. "It is clearly *not irrational* to conclude that individuals may believe what they want, but the concerted group activity, or solicitation therefor, would pose additional and unwarranted problems and frictions in the operation of the State's penal institutions." *Id.* at 129, 97 S.Ct. at 2539 (emphasis added).

2. "The ban on inmate solicitation and group meetings, therefore, was *rationally related* to the reasonable, indeed to the central, objectives of prison administration." *Id.* (emphasis added).

3. "An examination of the potential restrictions on speech or association that have been imposed by the regulations under challenge, demonstrates that the restrictions imposed are *reasonable,* and are consistent with the inmates' status as prisoners and with the legitimate operational considerations of the institution." *Id.* at 130, 97 S.Ct. at 2540 (emphasis added).

4. "First Amendment associational rights, while perhaps are more directly implicated by the regulatory prohibitions, likewise must give way to the *reasonable* considerations of penal management." *Id.* at 132, 97 S.Ct. at 2541 (emphasis added).

5. "Appellant prison officials concluded that the presence, perhaps even the objectives, of a prisoners' labor union would be detrimental to order and security in the prisons, . . . . It is enough to say that they have not been conclusively shown to be wrong in this view." *Id.*

6. "If the appellants' views as to the possible detrimental effects of the organizational activities of the Union are *reasonable,* as we conclude they are, then the regulations are drafted no more broadly than they need to be to meet the perceived threat . . . ." *Id.* at 133, 97 S.Ct. at 2541–42 (emphasis added).

The conclusion that the Supreme Court in *Jones* adopted a reasonable basis standard is buttressed by the dissent of Justice Marshall, with whom Justice Brennan joined. After advancing the proposition that a prisoner does not shed his basic first amendment rights at the prison gate, Justice Marshall stated the following:

It follows from this tenet that a restriction on the First Amendment rights of prisoners, like a restriction on the rights of non-prisoners, "can only be justified by a substantial government interest and a showing that the means chosen to effectuate the State's purpose are not unnecessarily restrictive of personal freedoms." . . . But the basic mode of First Amendment analysis—the requirement that restrictions on speech be supported by "reasons imperatively justifying the particular deprivation,"—should not be altered simply because the First Amendment claimants are incarcerated.

The Court today rejects this analytic framework, . . . . In testing restrictions on the exercise of that right the Court asks only whether the restrictions are "rationally related to the . . . objectives of prison administration," and whether

the reasons offered in defense of the restrictions have been "conclusively shown to be wrong."

*Id.* at 140, 97 S.Ct. at 2545 (Marshall, J., dissenting, joined by Brennan, J.) (citations and footnotes omitted). Significantly, the dissent stated: "Yet in no First Amendment case of which I am aware has the Court deferred to the judgment of such officials simply because their judgment was 'rational.'" *Id.* at 141, 97 S.Ct. at 2546.

Similarly, two years later, in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), a plurality of the Supreme Court deferred to the judgments of prison officials and utilized a rational basis standard. In *Bell,* inmates brought a class action challenging the constitutionality of numerous conditions of confinement in a federally operated short-term custodial facility designed primarily to house pretrial detainees. Specifically, Court held that the practice of housing two inmates in individual rooms originally intended for single occupancy did not deprive pretrial detainees of their liberty in contravention of the fifth amendment, a rule prohibiting inmates from receiving hard-cover books that are not mailed directly from publishers does not violate any constitutional guarantees, nor does body-cavity searches, the prohibition against the receipt of packages, or the room-search rule. Yet, in one part of its decision, the plurality stated the following:

> Respondents seem to argue that "double bunking" was unreasonable because petitioners were able to comply with a District Court's order forbidding "double bunking" and still accommodate the increased numbers of detainees simply by transferring all but a handful of sentenced inmates who had been assigned to the NCC [correctional center] for the purpose of performing certain services and by committing those tasks to detainees. That petitioners were able to comply with the District Court's order in this fashion does not mean that petitioners' chosen method of coping with the increased inmate population—"double bunking"— was unreasonable. *Governmental action does not have to be the only alternative or even the best alternative for it to be reasonable, to say nothing of constitutional.*

*Id.* at 542–43 n. 25, 99 S.Ct. at 1876 n. 25 (emphasis added). Again, as in *Jones,* Justice Marshall, in dissent, implied that the Court's decision embodies a reasonableness standard. *Id.* at 565, 99 S.Ct. at 1887 (Marshall, J., dissenting). *See also Rhodes v. Chapman,* 452 U.S. 337, 349–50, 101 S.Ct. 2392, 2400–01, 69 L.Ed.2d 59 (1981) (double celling held not cruel and unusual punishment prohibited by the eighth and fourteenth amendments).

Accordingly, the central issue presented in this case is whether the state regulation on beards and facial hair is rationally related to legitimate state interests.

## IV. JUSTIFICATIONS OF THE REGULATION

 Defendants argue that the regulation is rationally related to the security of Georgia's penal institutions, the state's interest in discipline in prison contexts, and the state's interest in protecting the health of inmates. Each justification shall be discussed individually.

### A. SECURITY.

Defendants argue that the state regulation limiting beards rationally furthers the state's legitimate interest in maintaining security in two respects. First, defendants suggest that beards can be used to conceal contraband, such as drugs and weapons. Indeed, this record indicates that beards and long hair have been used in the past for concealing contraband. Furthermore, it is noteworthy that this plaintiff has been caught in a prison with a weapon on one occasion. Nevertheless, plaintiff presently is permitted a hair length of approximately three inches. Certainly, plaintiff could conceal in his hair anything that could be hidden in a beard. In other words, the growing of a beard would present no problems greater than those presented with plaintiff's present length of hair. Therefore, this justification is not reasonable.

Second, defendants submit that a limitation on beards facilitates the identification of escaped inmates. A prison warden and special agent of the Georgia Bureau of Investigation, who had been involved in the apprehension of 30 or 40 escaped prisoners, testified. The agent said that in such an investigation, facial structure was the principal means of identification. A beard, of course, obscures many of these features. Further, if the investigator knows that the fugitive was clean shaven at the time of the escape, it limits the number of people he must scrutinize, at least during the early days of the investigation; if the fugitive is both clean shaven and has relatively short hair, he presents a picture in contrast with many of the styles of the day. Further, it is much easier for an escapee with a full beard to alter his appearance so as practically to frustrate identification. Other witnesses as well pointed out that there are innumerable modifications of a full beard that truly change appearance. Mr. Jerry Thomas testified that it might take months if not years to get a full dossier of pictures of a single inmate in all the different styles.

The warden also testified that escapes occur fairly often in the Georgia prison system. In one thirteen-month period there were 65 escapes from the maximum security institution at Reidsville alone.

The record before this court does not support the finding in *Teterud, supra,* that periodic rephotographing is a viable, less restrictive (or rational) alternative. The court, therefore, finds that the restriction at issue is rationally and reasonably related to legitimate enforcement objectives.

### B. DISCIPLINE.

Defendants argue that the state's interest in maintaining discipline among inmates is closely related to its concern for security. Mr. Thomas testified that this regulation promotes discipline among inmates in a correctional context. Defendants flatly assert: "This is a rational position; therefore, the regulation is also valid on this ground." Post Hearing Brief of Defendants, at 25.

This record, however, is void of any evidence showing how a regulation of beards promotes discipline or how the operation of this regulation enhances the penal objectives of deterrence or rehabilitation. Therefore, there is nothing in this record to indicate how or why this interest is rationally being furthered by this regulation.

### C. HEALTH.

Testimony was presented to show that the regulation promotes hygiene and prevents outbreaks of lice. Yet, the medical testimony demonstrates that lice can be treated with long hair as well as short. Furthermore, the record shows that this interest is served by other methods which simultaneously advance other penal objectives. Therefore, it cannot be said that a state rule against beards rationally furthers the state's interest in protecting the health of inmates.

## V. CONCLUSION

In summary, the only legitimate state interest proffered which is logically related to a prison regulation requiring no beards is the security concern which allows for ease of identification upon escape. The significance of this interest is underscored in this case by the fact that this plaintiff is on death row at Jackson, a maximum security institution. As Mr. Thomas testified, these types of inmates are the most difficult to work with as they have nothing to lose. Although the federal prison system fails to implement such a no-beard regulation, this practice is not particularly controlling. Testimony was presented that federal inmates are generally less violent and pose fewer security problems than do state inmates, and that federal inmates are more sophisticated and less escape proned than state inmates.

Therefore, this court concludes that "[t]he informed discretion of prison officials that there is potential danger ... [is] sufficient for limiting rights even though this showing might be 'unimpressive if ... submitted as justification for governmental restriction of personal ... [religious expression] among members of the general public.'" *Jones,* 433 U.S. at 133 n. 9, 97 S.Ct.

at 2541 n. 9 (quoting *Pell v. Procunier,* 417 U.S. 817, 825, 94 S.Ct. 2800, 2805, 41 L.Ed.2d 495 (1974)). This is not a case where the justifications are founded only on fear and apprehension. *See Teterud,* 522 F.2d at 361–62. Accordingly, Regulation 125–2–8–.04(6), to the extent that it prohibits this Sunni Muslim at a maximum security prison from growing a beard in conformity with his religious beliefs, is not violative of the first amendment. Plaintiff's motion for a preliminary and permanent injunction is therefore hereby DENIED. Let judgment be entered for the defendant.