**Yevgen FROMER, Plaintiff,**

v.

**Charles J. SCULLY, Harold J. Smith, Walter Kelly, Everett W. Jones, Thomas A. Coughlin III, and Hirschel Jaffe, Defendants.**

**No. 84 Civ. 5612 (CES).**

United States District Court, S.D. New York.

Nov. 25, 1986.

Rosenman Colin Freund Lewis & Cohen, New York City, for plaintiff; Eugene A. Gaer, Neil Miller, of counsel.

Robert Abrams, Atty. Gen., State of N.Y., New York City, for defendants; Martha O. Shoemaker, Douglas Aronin, of counsel.

## OPINION

STEWART, District Judge:

Plaintiff Yevgen Fromer, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), challenges the constitutionality of DOCS Directive # 4914 to the extent that it requires him to shave or trim his beard to a length of no more than one inch.[1] Fromer, an Orthodox Jew, claims that his religious beliefs prohibit him from shaving or trimming his facial hair. During the six days of trial in this action, we heard from numerous witnesses regarding the sincerity of Fromer's religious beliefs and the concerns of DOCS that underlie the beard regulation. We now conclude that Fromer is entitled to the injunctive and declaratory relief that he seeks. Our findings of fact and conclusions of law are set forth below.

## SINCERITY OF RELIGIOUS BELIEF

■ Directive # 4914 establishes basic grooming standards for inmates in the New York state prison system. Pl.Ex. 1. The directive provides that upon being committed to the custody of DOCS, inmates must get a haircut and shave "for reasons of health and sanitation as well as to permit the taking of the initial identification photograph." Thereafter, however, "[a]ll inmates may grow a beard and/or mustache not to exceed one (1) inch in length."

In order to establish his first amendment interest in challenging Directive # 4914, Fromer, as an initial matter, must demonstrate that his beliefs are sincerely held and "are, in his own scheme of things, religious." *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965); *see also Furqan v. Georgia State Board of Offender Rehabilitation,* 554 F.Supp. 873, 876 (N.D.Ga.1982). In evaluating the religious nature of Fromer's beliefs, this court must not employ an objective, content-based approach to defining religious belief but rather must examine the plaintiff's "inward attitudes towards a particular belief system." *Patrick v. Le-Fevre,* 745 F.2d 153, 157 (2d Cir.1984).

Plaintiff asserts that his refusal to trim his beard is based on the Torah, specifically, on a passage in Leviticus, one of the five books of Moses, which states that one should not mar the corners of the beard. Tr. 104. Fromer testified that he views the wearing of an untrimmed beard as "the main bulwark that would be used against evil," Tr. 103, in that the beard is a physical, unalterable, public symbol of observance of Jewish law "to the highest degree." Tr. 103–04, 234–35. Fromer further stated that he wants to leave his beard untrimmed "to prevent myself from any further breaking the law, civil law or Jewish law or any law, and stay with the hundred percent way of Judaism." Tr. 114.

We find that Fromer has met his burden of showing that his refusal to obey Directive # 4914 is grounded in a sincere religious belief that trimming the beard violates Jewish law. Fromer's refusal to trim his beard is consistent with his religious background and training and is root-

---

**1.** Plaintiff commenced this action pro se in 1984 claiming retaliatory transfer and deprivation of kosher food and religious services. Following appointment of counsel, Fromer filed an amended complaint which added claims regarding the beard restriction. By order dated July 8, 1985, we consolidated the hearing on plaintiff's application for a preliminary injunction with the trial on the merits of the beard claims.

ed in a body of Jewish law. Furthermore, we find Fromer's testimony regarding his religious beliefs to be credible and find his conduct since he entered prison to be consistent with his professed beliefs.

Fromer was born in 1959 in a town in the Ukraine, Soviet Union, where he lived until the age of fifteen. Tr. 81–82. As Orthodox Jews, Fromer's family members observed "all the practices ... most orthodox Jews do" in the United States, including, for example, keeping Passover strictly. Tr. 83. Members of Fromer's family were leaders in the town's small Jewish community, and weekly religious services were held in Fromer's house. Fromer himself as a child learned how to read Hebrew and studied the Bible with various teachers. At age thirteen he had a bar mitzvah and began to observe the religious practices imposed upon adult men. Tr. 83–88.

While he was in the Soviet Union, Fromer did not receive religious instruction regarding the maintenance of a beard. On cross-examination, Fromer admitted that before he left the Ukraine, the general practice of his male relatives was to either trim or shave their beards. Tr. 164. However, Fromer also testified that he was told that the rabbi grandfather after whom he was named had an untrimmed beard all his life. Tr. 166. Also, one of the two shoctim, or religious officials, in his community had an untrimmed beard. Tr. 165. Fromer resolved in his youth that "one day when I will be able to I will have a beard." Tr. 89.

In 1975, Fromer and his mother arrived in Brooklyn. Tr. 90. Shortly after his arrival, Fromer enrolled in two yeshivas associated with the Lubavitch Hasidic movement. He moved into a Lubavitch dormitory, where he lived until late 1977. Tr. 90–91. During this period he did not discuss with any of his teachers or relatives whether trimming the beard was permitted. Tr. 174. Fromer knew that at least some of his uncles trimmed their beards. However, he observed that all the teachers at his yeshivas had long untrimmed beards and that none of the boys

who lived in his dormitory trimmed their facial hair. Tr. 91–92, 94, 96–97, 224.

Around late 1977, Fromer became a bus driver for schools operated by the Lubavitch movement. Fromer continued his religious studies with two men, who told him that Orthodox Jews were forbidden to disturb their beards. Tr. 94. In early 1978, Fromer went to Los Angeles to assist a rabbi in starting a Lubavitch camp for Russian immigrants. Tr. 96. Fromer returned to Brooklyn in late 1978 and started a transportation business that primarily serviced yeshivas. Tr. 97.

During the years when Fromer was enrolled in the yeshivas and was in Los Angeles, he maintained an untrimmed beard. Tr. 97. However, around 1980, he experienced a business setback and decided that if he became more assimilated into the society around him, he would be able to gain more customers. Accordingly, he began trimming his beard and then shaved it off entirely. In addition, he grew his hair longer, shortened his prayers, and wore his yarmulke sporadically. Tr. 98–99. During this period, he engaged in the criminal activity that led to his incarceration.

Fromer testified that in early 1982 he decided that he wanted to resume Jewish religious practices. He began to grow his beard again and vowed that he would completely return to Judaism after his financial problems were over. Tr. 100. At the time of his arrest on a charge of selling cocaine in June 1982, he was bearded. Tr. 102.

During the eight months Fromer spent in the Brooklyn House of Detention prior to his sentencing, he did not trim his beard. Fromer testified that he came to believe that he had ended up in prison because he had failed to abide by Jewish law. Accordingly, he began to study Judaism and observe religious practices that he had previously abandoned. Tr. 103–04.

Fromer entered the custody of DOCS in March 1983. Upon his admission to Downstate Correctional Facility, he was told that he was required to remove his beard. Fromer testified that he requested that an electric shaver rather than a razor be used

if he had to be shaved, Tr. 105–07, because he believed that using an electric shaver was less of a violation of Jewish law than using a razor. *See* Tr. 180. As a result of his request, Fromer stated, he was handcuffed and prodded with a stick by one correction officer while another shaved him with a razor. Tr. 107.

After this initial shave, Fromer let his beard grow undisturbed until an officer at Green Haven Correctional Facility, where Fromer had been transferred, told him to bring his beard into compliance with the one-inch regulation. Fromer then requested that his mother send him an electric shaver, which he used to shave the upper part of his cheeks and neck. However, Fromer did not shave his jaw or near his ears in order to comply with the biblical prohibition on marring "the five corners of the beard." Tr. 109–10.

In the summer of 1983, Fromer was transferred to a different cellblock within Green Haven. At that time, Fromer stopped shaving and trimming his beard completely, both because no correction officer pressured him and because his conviction that his beard should not be trimmed became strengthened. Tr. 113–14. Fromer had intensified his study of Judaism and had attended a sermon by a Lubavitcher regarding the reasons why Jews have untrimmed beards. Tr. 220, 226. In addition, Fromer was influenced by the fact that Sheldon Silver, an attorney and rabbi with whom Fromer met to discuss religious practices at Green Haven, had a long untrimmed beard. Tr. 226–28.

In April 1984, Fromer was transferred to Attica Correctional Facility, where he was told to trim his beard to one inch. Tr. 121. Fromer wrote to Superintendent Harold J. Smith to protest that the application of Directive # 4914 to him violated his first amendment rights. Pl.Ex. 7A. Fromer stated that as an Orthodox Jew, he considered his beard part of his "religious dress." He added that he did "not claim exemption in the cutting of my beard out of personal appearance objectives, but rather out of religious tenets." After Smith denied Fromer an exemption, Fromer filed a grievance with the Attica inmate grievance committee. Pl.Ex. 7B. Although the grievance was denied, Fromer never received a direct order to trim his beard while at Attica, nor did he receive any misbehavior reports there. Tr. 136.

In January 1985, Fromer was transferred to Great Meadow Correctional Facility. Tr. 138. Rabbi Weinberg, the Jewish chaplain at Great Meadow, requested that Deputy Superintendent Cassidy excuse Fromer from shaving or trimming his beard, explaining: "Y. Fromer is an Orthodox Jew of Lubavitch Hassidic sect. These Jews, for religious reasons do not shave or trim their beards." Pl.Ex. 24. However, Fromer was twice disciplined for disobeying an order to trim his beard and required to submit to counseling. Pl.Ex. 8–11. In February 1985, Fromer commenced the portion of this action which challenges Directive # 4914.

In May 1985, Fromer's request to be transferred from Great Meadow, a maximum security prison, to Wallkill Correctional Facility, a medium security prison, was granted. Tr. 148. On the day he arrived at Wallkill, he was told that he would have to trim his beard. Fromer explained that this lawsuit was pending in federal court. Tr. 149. However, Fromer was found guilty of failing to comply with a direct order to trim his beard and was subsequently sentenced to thirty days in a special housing unit. Pl.Ex. 13. Inmates in special housing units are confined to their cells twenty-three hours per day and are denied many of the privileges available to general population inmates. Because Wallkill has no special housing unit, Fromer was transferred to Downstate to serve his sentence. Tr. 152. In addition, Fromer lost one month of good time as well as commissary and telephone privileges. In June 1985, this court granted Fromer's motion for injunctive relief barring enforcement of Directive # 4914 against him and directing his release from the special housing unit.

To demonstrate that his beliefs regarding his beard are grounded in Jewish law, plaintiff presented the testimony of Rabbi Moshe Wiener,[2] who has written a treatise on the growth and cutting of the beard in Jewish law. Rabbi Wiener testified extensively as to the origins of the biblical prohibition on disturbing the beard and stated that "it is the opinion of the mainstream of Jewish authorities throughout the centuries that even trimming the beard should be definitely avoided and proscribed according to Jewish law." Tr. 21. He explained:

> [T]he custom of Jews . . . throughout the centuries was not to disturb the beard in any manner whatsoever. In fact, the cutting of the beard was always considered an act of religious desecration and sacrilege and was considered an act of basic negating of one's religious functions and religious beliefs.

Tr. 20. Rabbi Wiener testified that, in his opinion, an observant Jewish man is required to refuse to comply with the portion of Directive # 4914 that limits beards to one inch in length. Tr. 30.

As evidence of plaintiff's insincerity, defendants point to the facts that Fromer did not ask a rabbi whether he should trim his beard, Tr. 218–20, and that he cut his hair on a day when Jewish law would appear to prohibit such an activity. Tr. 195. They characterize his account of his initial forcible shave at Downstate as "manifestly incredible," noting that Fromer failed to file a grievance after this alleged incident and that no "use of force" or "unusual incident" report was written up by corrections personnel. Tr. 320–21. In addition, a counselor at Great Meadow described plaintiff's attitude toward his beard problem as "lighthearted." Tr. 289. Defendants further argue that Fromer, during a visit with his mother and cousin at Wallkill, nodded when his cousin assured a counselor that plaintiff would trim his beard. Tr. 259. Finally, they cite to Fromer's inconsistent adherence to an Orthodox Jewish lifestyle and assert that Fromer did not cease trimming his beard until he began this action.

As their religious expert, defendants called Rabbi Moshe Tendler, a professor of Talmudic law at Yeshiva University.[3] Rabbi Tendler testified that although Jewish law prohibits shaving the face with a razor, Tr. 620, "with the rarest exception, all people who consider themselves to be meticulously observant in Jewish law" believe that trimming the beard is not only allowed but indeed is required before certain holidays and events. Tr. 617. Rabbi Tendler further stated that Jewish law requires obedience to the civil law of the state, including prison regulations, as long as not anti-semitic in nature. Tr. 631–32. According to Rabbi Tendler, Jewish law would also require Fromer to accede to his mother's request to trim his beard in order to avoid a transfer to another prison that would make it more difficult for her to visit him. Tr. 635–36.

We find that the evidence, taken as a whole, establishes the sincerity of Fromer's religious belief. Fromer's refusal to trim his beard is consistent with his upbringing as an Orthodox Jew and with his education at Lubavitch yeshivas. Moreover, Rabbi Wiener's testimony established that the practice of not disturbing the beard is grounded in a recognized body of Jewish doctrine. Although Rabbi Tendler vigorously disputed Rabbi Wiener's views, he did concede the existence of rabbinical opinion prohibiting the trimming of the beard. We do not attempt to resolve the controversy between the two rabbis, for "the judicial process is singularly ill equipped to resolve [intrafaith] differences in relation to the Religion Clauses." *Thomas v. Review Board of the Indiana Employment Secur-*

---

**2.** Rabbi Wiener has been ordained by the Mirrer Yeshiva and the United Lubavitcher Yeshiva and is presently director of the Jewish Community Council of Greater Coney Island. Tr. 9–10.

**3.** Rabbi Tendler was ordained by Yeshiva University and is chairman of the biology depart-ment there. He is a member of the Beth Din rabbinic court and is on the executive committee of the Union of Orthodox Rabbis of the United States. His father-in-law was Rabbi Moshe Feinstein, a leading Talmudic scholar until his death earlier this year. Tr. 602–04.

*ity Division,* 450 U.S. 707, 715, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981). Furthermore, "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." *Id.* at 715–16, 101 S.Ct. at 1430–31; *accord, Moskowitz v. Wilkinson,* 432 F.Supp. 947, 949 (D.Conn.1977) ("[T]he fact that some Jews do not object to shaving, or that others accept the distinction between shaving and cutting, does not defeat the plaintiff's claim. It is his own religious belief that is asserted, not anyone else's."); *Monroe v. Bombard,* 422 F.Supp. 211, 215 n. 4 (S.D.N.Y.1976) ("It is not for the courts to decide which practices or observances are or are not strict requirements of a particular faith.").[4]

The sincerity of Fromer's belief is also evinced by his conduct since his incarceration. Although it is obvious that Fromer at times has departed from the tenets of his faith, we are persuaded that his commitment to Orthodox Jewish observance has intensified as a result of his religious studies and reflection while in prison. Furthermore, having examined the photographs in evidence, we find that Fromer has been consistent in his refusal to trim his beard since the end of summer 1983, even though repeatedly threatened with disciplinary action.

## STANDARD OF REVIEW

■ Having found that Fromer has a sincere, religious belief which prohibits him from trimming his beard, we must determine what standard of review to apply to Fromer's claim that Directive # 4914's grooming requirements infringe upon his first amendment right to freely exercise his religion. We begin with the proposition that "[a] prisoner does not shed ... basic First Amendment rights at the prison gate." *Procunier v. Martinez,* 416 U.S. 396, 422, 94 S.Ct. 1800, 1815, 40 L.Ed.2d 224 (1974) (Marshall, J., concurring). Furthermore, "a prisoner retains those First

Amendment guarantees, including the right to participate in practices which are an integral part of his religious faith, 'that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Moorish Science Temple of America, Inc. v. Smith,* 693 F.2d 987, 990 (2d Cir.1982) (quoting *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). Because security is the main objective of prison administration, however, "prison officials must have broad latitude to adopt rules that protect the safety of inmates and corrections personnel and prevent escape or unlawful entry." *United States v. Cohen,* 796 F.2d 20, 22 (2d Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986) (citing *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979)).

In *Wali v. Coughlin,* 754 F.2d 1015 (2d Cir.1985), the Second Circuit recently set out a tripartite standard by which to evaluate claimed violations of prisoner rights. The standard is "drawn by reference to the nature of the right being asserted by prisoners, the type of activity in which they seek to engage, and whether the challenged restriction works a total deprivation (as opposed to a mere limitation) on the exercise of that right." *Id.* at 1033. First, where the right asserted is held to be inherently inconsistent with established penological objectives, judicial deference to the judgment of corrections officials should be nearly absolute. Second, where the activity sought to be engaged in is presumptively dangerous, deference should be extremely broad, though not categorical. Third,

> [w]here ... the activity in which prisoners seek to engage is not presumptively dangerous, and where official action (or inaction) works to deprive rather than merely limit the means of exercising a protected right, professional judgment must occasionally yield to constitutional mandate. In these limited circumstanc-

---

**4.** Plaintiff's Exhibits 23, 24, and 25 and defendants' Exhibit BB, all of which were offered after trial, were admitted into evidence.

es, it is incumbent upon prison officials to show that a particular restriction is necessary to further an important governmental interest, and that the limitations on freedoms occasioned by the restriction are no greater than necessary to effectuate the governmental objective involved.

*Id.*

Defendants argue that the *Wali* analysis does not govern here. As they point out, *Wali* was a first amendment censorship action involving a prior restraint on access to information, not a free exercise of religion suit. Defendants contend that under *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), and *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), when an inmate brings a free exercise challenge to a regulation justified by legitimate penological objectives, courts must defer to the judgment of expert prison administrators unless the inmate can show, by substantial evidence, that the regulation constitutes an exaggerated reaction to security considerations. Defendants point out that such a standard has been adopted by a number of circuits. *E.g.*, *Hill v. Blackwell*, 774 F.2d 338, 342–43 (8th Cir.1985); *Madyun v. Franzen*, 704 F.2d 954, 959–60 (7th Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983); *St. Claire v. Cuyler*, 634 F.2d 109, 114–15 (3d Cir.1980).

We find the *Wali* case to be controlling here. We first note that the *Wali* court's analysis of Supreme Court precedent included *Jones v. North Carolina Prisoners Union* and *Bell v. Wolfish*. Moreover, we are persuaded by the Third Circuit's conclusion in *Shabazz v. O'Lone*, 782 F.2d 416 (3d Cir.) (en banc), *cert. granted*, — U.S. —, 107 S.Ct. 268, 93 L.Ed.2d 245 (1986), that the standard proposed by defendants "provides inadequate protection for the rights of prisoners freely to exercise their religion." *Id.* at 417; *see also id.* at 420.

In *Shabazz*, Muslim prisoners challenged prison regulations that prevented them from attending weekly religious services as violative of their first amendment rights. The *Shabazz* court found *St. Claire's* "exaggerated response" standard, 634 F.2d at 114–15, which defendants urge us to adopt, to be flawed because it failed to "require any inquiry into the feasibility of accommodating prisoners' religious practices." *Shabazz*, 782 F.2d at 420. Rather, "a 'mutual accommodation' between the important institutional objective of security and the constitutionally protected rights of prisoners" is required under *Bell v. Wolfish*, 441 U.S. at 546, 99 S.Ct. at 1877, and *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). *Shabazz*, 782 F.2d at 419. To replace the *St. Claire* standard, the Third Circuit adopted the following analysis for cases involving free exercise rights:

> [T]he state must show that the challenged regulations were intended to serve, and do serve, the important penological goal of security, and that no reasonable method exists by which [the inmates'] religious rights can be accommodated without creating bona fide security problems.

*Shabazz*, 782 F.2d at 420. In the context of the case before us, the *Shabazz* analysis is substantially identical to the third part of the *Wali* standard of review.

We hold that the third *Wali* standard governs the case before us. The first standard is inapplicable because the right of prisoners to wear beards is not inherently inconsistent with established penological objectives. *See Burgin v. Henderson*, 536 F.2d 501 (2d Cir.1976); *Sostre v. Preiser*, 519 F.2d 763, 764 (2d Cir.1975); *Moskowitz v. Wilkinson*, 432 F.Supp. 947 (D.Conn. 1977); *Monroe v. Bombard*, 422 F.Supp. 211 (S.D.N.Y.1976). The second standard does not apply because unrestricted beard growth is not presumptively dangerous [5] and because requiring Fromer to cut his facial hair would work a total deprivation of his religious belief that the beard must not be disturbed.

---

**5.** See our discussion of the government's security concerns below.

The third *Wali* standard, furthermore, is consistent with prior Second Circuit cases concerning beards in prison. In *Burgin*, Sunni Muslim prisoners asserted their first amendment right to grow beards. While remanding for factual development, the Second Circuit set forth the following standard:

"But even if the institutional purpose [in prohibiting beards] is legitimate and substantial, 'that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' *Shelton v. Tucker*, [364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960)], *Procunier v. Martinez*, [416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974)]."

*Burgin*, 536 F.2d at 504 (quoting *Sostre*, 519 F.2d at 764 (inmate challenge to "no beard" prison rule)). The "least restrictive alternative" analysis has also been employed by two district courts to strike down the no-beard rule as applied to prisoners who declined to remove their beards on the basis of sincerely held religious beliefs. *Moskowitz*, 432 F.Supp. at 951 (Orthodox Jew in federal prison); *Monroe*, 422 F.Supp. at 218 (Sunni Muslims in state prison); *see also People v. Lewis*, 68 N.Y.2d 923, 510 N.Y.S.2d 73, 502 N.E.2d 988 (N.Y.1986) (portion of Directive # 4914 requiring Rastafarian inmate to cut dreadlocks for initial photograph held unconstitutional under either the "least intrusive means" or "exaggerated response" test, because facial features can be fully exposed merely by pulling hair back), *aff'g*, 115 A.D.2d 597, 496 N.Y.S.2d 258 (2d Dep't 1985); *Phillips v. Coughlin*, 586 F.Supp. 1281, 1285 (S.D.N.Y.1984) (Directive # 4914's requirement that all inmates submit to initial shave upheld as "least intrusive method available" to satisfy state's interest in photographing facial features); *Gallahan v. Hollyfield*, 670 F.2d 1345, 1346 (4th Cir.1982) (least restrictive alternative standard used to enjoin cutting of Cherokee Indian's hair);

*Wright v. Raines*, 457 F.Supp. 1082, 1088 (D.Kan.1978) ("no beard" regulation struck down as applied to Sikh inmate because regulation does not represent least restrictive method of obtaining goal of security).

Accordingly, defendants must show that application of the one-inch beard restriction is "necessary to further an important governmental interest." *Wali*, 754 F.2d at 1033. In addition, they must establish "that the limitations on freedoms occasioned by the restriction are no greater than necessary to effectuate the governmental objective involved." *Id.*

## GOVERNMENTAL INTERESTS

Philip J. Coombe,[6] Deputy Commissioner for Facility Operations of DOCS, testified that the governmental interests in identification of inmates, control of contraband, fairness, safety, and hygiene all necessitate the one-inch limit on beards. While each of these interests is unquestionably important in the prison setting, we conclude that defendants have not established that the beard restriction is no greater than necessary to effectuate the governmental objectives involved.

### Identification

The governmental interest in effective identification of inmates to insure prison security and to facilitate apprehension of escaped inmates is important and substantial. *Moskowitz*, 432 F.Supp. at 950. Defendants' evidence establishes that allowing inmates to wear beards poses heightened difficulties in identification. Coombe testified that two inmates escaped from the Green Haven visiting room after shaving their beards and donning women's clothing in the bathroom. Tr. 347, 376.

We are not persuaded, however, that beards longer than one inch pose a significantly greater risk than beards of one inch or less. Coombe testified that while he would prefer to require inmates to be

---

6. Mr. Coombe is responsible for the security of the fifty correctional facilities operated by DOCS and reports directly to Commissioner Coughlin. He has served as superintendent of the Otisville and Eastern Correctional Facilities. Tr. 337–38, 341.

clean-shaven and to wear their hair short, the prison system can tolerate beards up to one inch because facial structure is still visible when the beard is short. Tr. 351. He argued that a long, untrimmed beard would provide an inmate with a set of disguises, in that the inmate could roll, braid, or otherwise manipulate his beard. Tr. 353. The fact that an inmate has innumerable opportunities for instant disguise increases his willingness to escape and makes an escape attempt more likely to succeed. Tr. 381–82.

On this point, we are more inclined to accept the testimony of plaintiff's prison expert, Daniel J. Pochoda,[7] who disagreed with Coombe's assertion that a one-inch beard allows significantly better observation of an inmate's facial structure than does a longer beard. In Pochoda's view, "the change in appearance is brought about by a beard of one inch versus no beard at all, as opposed to a difference of one inch and two or three or four or longer." Tr. 428. Under Directive # 4914, inmates currently have the option of keeping their hair in any length and any style and of keeping their mustaches and beards in any style not exceeding one inch in length. Since inmates may drastically change their appearances in numerous ways while still complying with Directive # 4914, we are not persuaded that the additional disguise options of a braided or rolled beard would lead to an increase in escape attempts or in disciplinary problems within the prison.[8]

To the extent that the one-inch beard restriction does promote identification of inmates, that objective can be obtained by the less restrictive means of rephotographing the inmate whenever the growth of his beard significantly changes his appearance.[9] Directive # 4914 already requires a clean-shaven picture of every inmate upon entry to the prison system. In addition, Directive # 4914 provides that an inmate can be rephotographed at his own expense "[i]f, in the opinion of the Correction Officer or Supervisor, an inmate drastically changes his appearance by changing the length of his hair or growing or shaving a beard and/or mustache." "While such an alternative may be administratively inconvenient or financially burdensome, such difficulties do not suffice to excuse the state from according basic constitutional rights to inmates." *Monroe v. Bombard*, 422 F.Supp. at 217.

*Contraband*

Defendants contend that the one-inch beard rule is necessary to prevent inmates from concealing contraband. One of defendants' attorneys demonstrated at trial that he could secrete and securely hold a nail file in his four-inch beard. Tr. 385–86. A nail file resembles a shank, or sharpened piece of metal, which inmates use as a weapon. Tr. 352.

---

7. Pochoda has worked as a staff attorney with the Prisoners' Rights Project of the New York Legal Aid Society, executive director of the New York State Commission of Corrections, director of the Minimum Standards Unit of the New York City Board of Corrections, chair of a corrections task force of the New York State Division of Criminal Justice Services, and president of the Correctional Association of New York. Tr. 398–408.

We reject defendants' assertion that Pochoda's expert testimony must be disregarded because his "political convictions are very radical." Defendants' Post-Trial Memorandum at 30. We also find defendants' contention that Pochoda "assisted [Attica] inmates in efforts to leverage their demands through illegal strikes" in 1983 to be unsupported. *Id.* at 84.

8. Defendants' contention that long beards would pose a significant security threat is also under-

mined by the fact that the escape rate in New York is one of the lowest in the United States, Coombe, Tr. 348, and by the experience of other prison systems that allow beards of any length. The New York City, federal, and California prison systems all do not restrict beards. Pl. Ex. 18; Combe, Tr. 513. Pochoda, who conducted research in the city correctional system for two years while drafting minimum standards for the New York City prisons, testified that the city has not encountered any problems in security, identification of inmates, safety, or hygiene resulting from its lack of beard restrictions. Tr. 433.

9. Defendants argue that obtaining photographs of inmates wearing all the variations that could be adopted with a long beard would be impossible. However, photographs of the multiplicity of appearances possible with various hairstyles and facial hair not exceeding one inch are not considered necessary by DOCS.

While we recognize the magnitude of the contraband problem facing prison authorities, we find that drugs or weapons could be hidden at least as easily in an inmate's long hair, clothing, or body as in his beard. In fact, defendants' expert conceded that he had never heard of an instance where an inmate had concealed contraband in his hair or beard. Coombe, Tr. 374–75. Furthermore, the governmental objectives of discouraging and detecting contraband in long beards may be served by the search procedures currently in effect. Inmates are searched periodically with metal detectors. In addition, during contraband searches the inmate is required to run his fingers through his hair and beard. If the correction officer suspects that something is still concealed, he himself can run his fingers through the inmate's beard and hair. Coombe, Tr. 373. Therefore, less restrictive alternatives are available to deal with the contraband problem.

*Fairness*

Defendants argue that the one-inch beard requirement is a neutral, consistent rule that can be understood easily by both staff and inmates. Allowing exceptions to fair and uniform regulations, defendants claim, creates confusion, resentment, and opportunities for confrontation between inmates and guards.

Defendants' position is belied by the fact that numerous DOCS directives already provide for exemptions for prisoners who have sincerely held religious beliefs. For example, "American Indians involved in scheduled and approved Indian cultural ceremonies" need not comply with the portion of Directive # 4914 that requires long hair to be tied back in a ponytail. Directive # 4202 provides that dietary requirements and the restrictions on activity of an inmate's Sabbath should be observed, and allows inmates to wear various religious items. Pl. Ex. 20. Pochoda testified that prisoners do not resent exemptions for other prisoners based on sincere religious belief as long as the exemption is based on a rule and all prisoners have the opportunity to demonstrate their religious interest. Tr.

432. To the limited extent that exceptions do result in confusion and resentment, these problems do not justify the impairment of Fromer's ability to observe his religious beliefs by growing his beard.

*Safety and Hygiene*

Defendants assert that an untrimmed beard can become caught in machinery and can pose a hygiene problem if the inmate is assigned to food service or if the beard becomes infested with vermin. Once again, we do not see a distinction between the situation presented by long hair and the situation presented by long beards. Inmates with long beards can be required to wear beard guards around machinery and food preparation areas or else be assigned to jobs not involving machines or foods. If vermin is detected in a beard, the inmate can be required to use a special shampoo to combat the problem or to cut his beard as a last resort.

## CONCLUSION

Plaintiff has established that his refusal to trim his beard to comply with Directive # 4914 is based on beliefs that are sincerely held and religious in nature. We conclude that defendants' interests in identification of inmates, control of contraband, fairness, safety, and hygiene can all be served with alternatives less restrictive than requiring Fromer to trim his beard. Thus, defendants have failed to show that the limitations on Fromer's religious freedom occasioned by the beard restriction are no greater than necessary to effectuate the governmental objectives asserted. *See Wali,* 754 F.2d at 1033.

Accordingly, the portion of DOCS Directive # 4914 requiring inmates to trim their beards to one inch in length is hereby declared unconstitutional as applied to Fromer. Defendants are hereby enjoined from trimming, shaving, or in any other way shortening Fromer's beard; from ordering Fromer to trim, shave, or otherwise shorten his beard; and from punishing Fromer for refusing to trim, shave, or otherwise shorten his beard. Furthermore, defendants are ordered to restore to From-

er all good time credits and any other privileges and benefits lost because of his past refusals to trim his beard. Defendants must also expunge from Fromer's record all references to disciplinary proceedings held because of the violation.

SO ORDERED.