MEMORANDUM OPINION AND ORDER
 

 KRAM, District Judge.
 

 Plaintiff, Gerald Ross, is an orthodox Jewish inmate in the custody of New York State’s Department of Correctional Services (“DOCS”). Ross seeks declaratory and injunctive relief as well as monetary damages against state prison officials. Plaintiff’s claims are grounded in the First and Fourteenth Amendments of the United States Constitution, as well as the Civil Rights Act of 1871, 42 U.S.C. § 1983
 
 [1]
 
 .
 
 *1237
 
 Specifically, plaintiff claims defendants have violated his right to receive kosher food, his freedom to possess and use religious articles necessary to practice and observe his religion, and his freedom to maintain untrimmed facial hair, in accordance with Jewish laws.
 

 Defendant, the Attorney General of New York (the “State”), moved to dismiss the case pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure asserting that the action was moot, relief was barred by the Eleventh Amendment, and plaintiff failed to state a claim under either the First or Fourteenth Amendment or 42 U.S.C. § 1983.
 

 Defendant’s motions were assigned to Magistrate Bemikow for a report and recommendation. Magistrate Bemikow provided this court with a report recommending that the defendant’s motions be denied. The case is before this court on defendant’s objections to the report. For the reasons that follow defendant’s objections are without merit and the Magistrate’s report is adopted.
 

 FACTS
 

 The facts as alleged in the complaint are as follow. The plaintiff is an observant Jewish prisoner. He comes from an orthodox Jewish family and attended Chassidic Rabbinical schools for the entirety of his education. Ross believes in the Jewish laws of kashruth
 
 [2]
 
 , the wearing of a yarmulke at all times
 
 [3]
 
 , the use of tephilin
 
 [4]
 
 and tsitsith
 
 [5]
 
 , and the prohibition against shaving or trimming his facial hair. The sincerity of his religious beliefs have not been challenged and are not in question.
 

 On May 16,1985, after Ross was convicted of first degree rape and first degree robbery and sentenced, he was moved to Downstate Correctional Facility, New York’s reception and processing center where inmates from city and county jails have their first contact with the New York State correctional system. The reception process includes photographing inmates, examining their belongings, searching their person and clothes, showering, and cutting their hair. Upon arrival Ross went through this initial screening, during which he first encountered resistance to his religious practices by New York State prison officials.
 

 Ross was taken off the transfer bus at 2:30 p.m. on May 16, 1985, led into the “draft room” and allegedly told by a prison official to, “get that shit off your head,” referring to Ross’ yarmulke. He also had in his possession tephilin and tsitsith. As Ross explained the religious significance of these objects a prison official told him to, “keep his mouth shut or [the guard] would ram the club down [Ross’] throat.” Ross complied with the orders and was told to sit in the waiting room, “but to be careful of the Nazis in there.”
 

 At 4:00 p.m. prison officials called Ross to the search table and found his religious articles. An official allegedly asked, “What type of shit do you call this?” slammed the tefillin on the table and announced, “You can’t have this shit here. Either send it home, or we’ll destroy it.” When Ross asked to see the directives on religious matters the official allegedly pulled out his club and told plaintiff, “Keep your fucking mouth shut and when you’re told to do something here, you do it without question, or you’ll find yourself in some trouble you won’t be able to get out of.” During his nine week stay at Downstate, none of Ross’ religious articles were returned to him, except for his yarmulke.
 

 Shortly thereafter, Ross was told by officials to shave his head and beard. Before arriving at Downstate, Ross had obtained a
 
 *1238
 
 letter from the Legal Aid Society stating that he could keep his beard until he could receive a letter from his Rabbi showing the sincerity of his belief and the importance of beard length in Jewish law. Ross was told by the official, “Wipe your ass with the [Legal Aid Society] letter and shave yourself, or Farrell will shave you.” After showering, Ross was pushed into the barber’s chair and poked with clubs while prison officials shaved his head and beard.
 

 At 5:30 p.m. Ross was told to dress and then get his food. When Ross explained that he only ate kosher food, he was allegedly told, “Where the fuck do you think you are, a Holiday Inn. You eat what’s here or starve, cause you’re in my home now, and I don’t cater to no Jew bastards.” During Ross’ stay at Downstate he ate only bread, fruit, dry cereal and water. He lost a substantial amount of weight because of this restricted diet.
 

 On July 19,1985 Ross was transferred to Green Haven Correctional Facility. Ross continued to encounter difficulties in the observation of his religious beliefs. The most significant problem was his beard. On arrival he was directed to trim his beard to be no longer than one inch, in accordance with directive # 4914 on prison “grooming standards.” Again, Ross refused and was disciplined by a prison official. After a letter was written by Rabbi Kasriel Kastel, and due to this pending litigation prison officials agreed to temporarily allow Ross to maintain his beard length beyond one inch.
 

 Since arriving at Green Haven Ross has been allowed to keep and wear his religious articles except when he is receiving visitors. Ross has not, however, consistently received kosher meals. During the first week of his incarceration at Green Haven Ross received no kosher food. Intermittently, he has been deprived kosher meals when taken to the dining room too late and the food is gone or he is not given enough time to eat. Ross remains in the custody of DOCS at Green Haven Correctional Institution.
 

 DISCUSSION
 

 In a motion to dismiss, the allegations of a complaint should be construed favorably to the pleader and not dismissed, “unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.”
 
 Conley v. Gibson,
 
 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957). The issue is not whether the plaintiff will ultimately prevail on his claims, but only whether he should be entitled to offer evidence in support of those claims.
 
 Scheuer v. Rhodes,
 
 416 U.S. 232, 236, 94 S.Ct. 1683,1686, 40 L.Ed.2d 90 (1974). For claims seeking relief under 42 U.S.C. § 1983, a plaintiff only need allege that a person acting under the color of state law deprived him of federal rights.
 
 Gomez v. Toledo,
 
 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980);
 
 Green v. Maraio,
 
 722 F.2d 1013, 1016 (2d Cir.1983).
 

 I. FIRST AMENDMENT
 

 The First Amendment provides that, “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof_” The free exercise clause is made applicable to the states by the Fourteenth Amendment.
 
 Cantwell v. Connecticut,
 
 310 U.S. 296, 303-07, 60 S.Ct. 900, 903-05, 84 L.Ed. 1213 (1940). In applying this constitutional right to convicted prisoners, two general principles have recently been reaffirmed by the Supreme Court in
 
 O’Lone v. Estate of Shabazz,
 
 — U.S.-, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) and
 
 Turner v. Safley,
 
 — U.S.-, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).
 

 First, “convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison”
 
 Bell v. Wolfish,
 
 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979);
 
 Accord Turner v. Safley,
 
 — U.S. -, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Basic First Amendment rights are not among those that “[a] prisoner shedfs] at the prison gate.”
 
 Procunier v. Martinez,
 
 416 U.S. 396, 422, 94 S.Ct. 1800, 1815, 40 L.Ed.2d 224 (1974). (Marshall, J., concurring);
 
 Pell v. Procunier,
 
 417 U.S. 817, 822, 94 S.Ct.
 
 *1239
 
 2800, 2804, 41 L.Ed.2d 495 (1974). A prisoner has the right to participate in practices which are an integral part of his religious belief.
 
 Moorish Science Temple of America v. Smith,
 
 693 F.2d 987, 990 (2d Cir.1982).
 

 Second, a prisoner’s rights must be balanced against a State’s right to limit First Amendment freedoms to meet valid penological objectives, including the deterrence of crime, rehabilitation of prisoners, and particularly institutional security.
 
 Pell,
 
 417 U.S. at 822, 94 S.Ct. at 2804;
 
 Procunier,
 
 416 U.S. at 412, 94 S.Ct. at 1811. In evaluating inmate claims of constitutional deprivations, federal courts should, “give appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar ... circumstances of penal confinement.”
 
 Jones v. North Carolina Prisoners,
 
 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed. 2d 629 (1977).
 
 Accord Turner v. Safley,
 
 — U.S.-, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).
 

 In
 
 Turner v. Safley,
 
 the Supreme Court set out a new standard to balance prisoner rights against a State’s need for legitimate correctional goals. “When a prison regulation impinges on inmates’ constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.”
 
 Turner,
 
 — U.S. at-, 107 S.Ct. at 2261. Drawing upon previous cases the Court identified three particular factors relevant to the “reasonable” determination test.
 

 First, “a regulation must have a logical connection to legitimate government interests invoked to justify it.”
 
 Turner,
 
 — U.S. at-, 107 S.Ct. at 2262. The beard-trim regulation challenged by Ross does not meet that standard. This regulation, part of DOCS directive # 4914, states, “All inmates may grow a beard and/or mustache not to exceed one (1) inch in length.” This regulation was extensively litigated in
 
 Fromer v. Scully,
 
 649 F.Supp. 512 (S.D.N.Y.1986), a suit with facts nearly identical to this case. Fromer, an orthodox Jewish inmate, was forced to keep his beard trimmed against Jewish laws and challenged the constitutionality of this regulation in Directive #4914. The Court held the beard-trim regulation was unconstitutional and on appeal the Second Circuit affirmed.
 
 Fromer v. Scully,
 
 817 F.2d 227 (2d Cir.1987).
 

 The State argues that since the Supreme Court rulings in
 
 O’Lone
 
 and
 
 Turner
 
 the standards used in
 
 Fromer
 
 are overruled. Regardless, the standards in
 
 Turner,
 
 applied in this case still could afford Ross relief. Under the new standard of “reasonably related” the government has not shown that the “beard-trim” regulation in Directive # 4914 is logically related to legitimate governmental interests to deprive a prisoner of First Amendment rights.
 

 In support of its claim, the State argues that Directive #4914 enables the government to identify and control contraband. The Court in
 
 Fromer,
 
 after extensive testimony, found these exact claims to be without merit. A prison expert testified that, “The change in [a prisoner’s] appearance [sufficient to pose a security problem] is brought about by a beard of one inch versus no beard at all, as opposed to a difference of one inch and two or three or four or longer.”
 
 Id.
 
 at 520. As the Court wrote, “Since inmates may drastically change their appearances in numerous ways while still complying with Directive # 4914, we are not persuaded that the additional disguise options of a braided or rolled beard would lead to an increase in escape attempts or in disciplinary problems within the prison.”
 
 Id.
 
 In finding that two inches of beard, rather than one, poses no valid penological concern, the Court wrote, “Defendants’ contention that long beards would pose a significant security threat is undermined by the fact that the escape rate in New York is one of the lowest in the United States, and by the experience of other prison systems that allow beards of any length.”
 
 Id.
 
 Further support in the
 
 Fromer
 
 case came from New York City prison officials who testified that the city has not encountered any problems in security or identification from its lack of beard restrictions.
 

 
 *1240
 
 Finally the State contends that the one-inch beard rule is necessary to prevent inmates from concealing contraband. In
 
 Fromer
 
 the Court held that search procedures could be used to detect contraband in long beards. The defendants’ expert in that case testified that he had never heard of a case where an inmate had concealed contraband in his beard.
 
 Id.
 
 at 520.
 

 The second factor articulated in
 
 Turner
 
 that this Court must consider is what, “alternative means of exercising the right ... remain open to prison inmates.”
 
 Turner,
 
 — U.S. at-, 107 S.Ct. at 2261. There are of course no alternative means by which Ross can exercise his First Amendment right. If the State requires him to cut his facial hair it will work a total deprivation of his religious belief that the beard must not be disturbed.
 

 The State claims that the facts in
 
 O’Lone
 
 are similar to this case and that Ross has alternative opportunities to exercise his religious beliefs. This Court finds the cases distinguishable. In
 
 O’Lone,
 
 Muslim inmates challenged a work regulation that prevented them from attending Jumu’ah, a Friday afternoon service. The inmates held jobs outside of the prison. In order to return to the prison for the afternoon service the prison had to provide special security guards and transportation. The State attempted alternatives, but the evidence showed that the return of prisoners during the day resulted in security risks and administrative burdens that prison officials found unacceptable. The Supreme Court agreed.
 

 In this case, the logistics are simple. Ross needs no transportation, causes no administrative burden and is not a security risk. The burden for the prison administration of occasionally searching a beard for contraband or pulling facial hair back for periodic identification photography is not of the same magnitude as arranging to transport prisoners in and out of a prison along the main access road, holding up traffic and creating institutional security and escape problems.
 

 Finally, in
 
 Turner
 
 the Court states that the validity of a regulation must be examined for what, “impact the accommodation of [a prisoner’s] asserted right would have on other inmates, on prison personnel, and on allocation of prison resources generally.”
 
 Turner,
 
 — U.S. at-107 S.Ct. at 2261. In
 
 Fromer
 
 the expert testified that, “prisoners do not resent exemptions for other prisoners as long as the exemption is based on a rule and all prisoners have the opportunity to demonstrate their religious interest.”
 
 Fromer,
 
 649 F.Supp. at 521. To the limited extent exceptions do result in confusion and resentment these problems do not justify denying Ross his First Amendment right to observe Jewish Laws by growing his beard.
 

 Although the “beard-trim” regulation is the heart of Ross’ First Amendment complaint, it appears that he also challenges the “initial shave” regulation, also in Directive #4914, as a violation of his religious beliefs. This regulation states, “Males received as new commitments shall get an initial haircut and shave ... to permit the taking of the initial identification photograph. Inmates who have a beard upon reception shall be permitted the option to use an electric razor....” This regulation has created problems before and has a long history of revisions.
 

 Prior to 1976, DOCS rules prohibited the wearing of beards by prison inmates. This rule was successfully challenged on constitutional grounds by a group of Sunni Muslim inmates.
 
 Monroe v. Bombard,
 
 422 F.Supp. 211 (S.D.N.Y.1976). Following
 
 Monroe,
 
 Directive # 4914 was modified to provide that inmates in reception and classification be shaven, but that once in the general prison population groomed beards were acceptable. Judge Sand of this Court later approved of the regulation.
 
 See Webb v. Dalsheim,
 
 80 Civ. 2705, slip op. (S.D.N.Y. Mar. 11, 1982).
 

 Most recently the regulation was upheld against a First Amendment free exercise challenge by a Rastafarian. The Court held that plaintiff’s religious interests were outweighed by the security needs of the prison to take identification photographs to be used in assisting to re-capture inmates in the event of escape.
 
 Phillips v.
 
 Cough
 
 *1241
 

 lin,
 
 586 F.Supp. 1281, 1284, n. 3 (1984). In this case Ross received the same treatment as the plaintiff in
 
 Phillips
 
 and there is little to distinguish the two cases.
 

 The recent Supreme Court standards established in
 
 Turner
 
 would also suggest that the “initial shave” regulation is not protected by the First Amendment. First the regulation is logically connected to legitimate penological interests. As the Court wrote in
 
 Phillips,
 
 “The fastest way for an individual to alter his appearance is by shaving his beard.”
 
 Id.
 
 at 1284. In the case of escape, “there is no way for DOCS to know what an inmate who wears a beard looks like without it.”
 
 Id.
 
 This is further supported by the plaintiffs prison expert who testified in
 
 Fromer
 
 that it was the heard itself, and not length that was determinative in identification.
 
 Fromer,
 
 649 F.Supp. at 520.
 

 Second, although there is no alternative means for Ross to exercise his religious right,
 
 Turner
 
 — U.S. at-, 107 S.Ct. at 2261, penological security interests outweigh First Amendment rights in this instance. There are ways, however, to minimize the religious trauma caused by a violation of Jewish laws. In
 
 Fromer,
 
 the plaintiff testified that the use of an electric shaver rather than a razor was less of a violation of Jewish Law.
 
 Fromer,
 
 649 F.Supp. at 514-515. Further, the “initial shave” is the least intrusive method available to prison officials for satisfying a legitimate penological interest.
 

 Third, even if the impact the accommodation would have on other inmates,
 
 Turner,
 
 — U.S. at-, 107 S.Ct. at 2261, is minimal, the other factors mentioned above still make the “initial shave” a reasonable and legitimate penological objective.
 

 In conclusion, Ross has stated a claim against the State concerning the violation of his First Amendment right to freely exercise his religion by forcing plaintiff to cut his facial hair. Ross has not stated a claim, under the First Amendment, against the State for forcing him to shave his hair and beard for an identification photograph.
 

 II. FOURTEENTH AMENDMENT
 

 The Due Process Clause of the Fourteenth Amendment provides, “[N]or shall any state deprive any person of life, liberty, or property, without due process of law.” The Due Process Clause was, “intended to secure the individual from the arbitrary exercise of the powers of government.”
 
 Daniels v. Williams,
 
 474 U.S. 327, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (quoting
 
 Hurtado v. California,
 
 110 U.S. 516, 527, 4 S.Ct. 111, 116, 28 L.Ed. 232 (1884)).
 
 See also Wolff v. McDonnell,
 
 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed. 2d 935 (1974). Historically, this guarantee has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property.
 
 Daniels v. Williams,
 
 106 S.Ct. at 665;
 
 Hudson v. Palmer,
 
 418 U.S. 539, 104 S.Ct. 3194, 41 L.Ed.2d 393 (1984);
 
 Inagraham v. Wright,
 
 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).
 

 A. Deprivation of Property
 

 In
 
 Hudson v. Palmer,
 
 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Court held a state employee’s unauthorized intentional deprivation of an inmate’s property is not a violation of due process if the inmate has available an adequate post-deprivation remedy.
 
 Id.
 
 at 533, 104 S.Ct. at 3204. The State argues that
 
 Hudson
 
 removes any possible doubt that Ross may be entitled to relief and argues for dismissal on those grounds. The Court, however, was ruling on a summary judgement motion not a motion to dismiss. Ross has not been given an opportunity to provide affidavits and evidence to support his claim and the State has not yet shown there is a post-deprivation remedy available. Furthermore, even if there is a post-deprivation remedy, it might not be adequate to compensate for the deprivation of the religious property at issue here.
 

 B. Deprivation of Kosher Food
 

 The courts have recognized that prison authorities must accommodate the rights of prisoners to receive diets consistent with their religious beliefs.
 
 See Kahane v. Carlson,
 
 527 F.2d 492, 495 (2d Cir.1975).
 
 *1242
 
 Prison authorities must provide, “a diet sufficient to sustain the prisoner in good health without violating the Jewish dietary laws, without otherwise mandating specific items of diet.”
 
 Id.
 
 at 496. The language of the opinion incorporated in the order implementing this standard states:
 

 ... at a minimum federal prisons must provide dietary laws that would not violate kosher requirements-for example, certain fruits, acceptable breads, cheeses, tinned fish, boiled eggs and vegetables, supplemented by hot kosher precooked frozen meals.
 
 (Id.)
 

 Based on this standard, there are possible due process violations if the State deprived Ross of kosher meals.
 

 According to the pleadings, Ross did not receive a nutritionally adequate diet for ten weeks of his incarceration. Plaintiff received no kosher meals at Downstate which allegedly resulted in significant weight loss. Upon arriving at Green Haven he was not put on the kosher food program for one week. These allegations are sufficient to state a claim against the State.
 

 The State argues that the prison authorities at Downstate met the standards required in
 
 Kahane
 
 by offering Ross the entire range of food served to the general population, which includes kosher food. Yet the items mentioned, eggs, peanut butter, cheese and milk, were allegedly not prepared according to the laws of Kashrut and therefore fail to meet the minimum standards required in
 
 Kahane.
 
 Further, it appears prison officials made it clear, with offensive slurs, that the prison would not accommodate Ross’ needs as a Jewish inmate.
 

 The State also argues that under
 
 Robles v. Coughlin,
 
 the failure of prison authorities to place Ross on a kosher meal plan at Green Haven for the first week is not a constitutional deprivation.
 
 Robles,
 
 725 F.2d 12, 15 (2nd Cir.1983). In
 
 Robles,
 
 however the Court held that a deprivation of food under certain circumstances may be recognized as being of constitutional dimensions.
 
 Id. Accord Ramos v. Lamm,
 
 639 F.2d 559, 571 (10th Cir.1980);
 
 Cunningham v. Jones,
 
 567 F.2d 653, 659-60 (6th Cir.1977). On a motion to dismiss, complaints should be liberally construed.
 
 Robles,
 
 725 F.2d at 15. Liberally construed, Ross’ complaint does state facte upon which he could recover.
 

 C. Excessive Use of Force
 

 Constitutional protection is less extensive than that afforded by common law tort action for battery, which makes actionable any intentional and unpermitted contact.
 
 Johnson v. Glick,
 
 481 F.2d 1028, 1033 (1973). In determining whether the constitutional line has been crossed, the Court in
 
 Johnson
 
 outlined factors to consider including, “the need for the application of force that was used, the extent of the injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.”
 
 Id.
 
 at 1033.
 

 Using this test it is not clear whether Ross’ due process rights have been violated in this claim. First, the forced shave was roughly done and there is no indication that the officials needed to use their clubs to get Ross to comply with their orders. Second, although Ross was not seriously injured the force used does not appear to have been used in a good faith effort. To the contrary, it appears that anti-semitic attitudes motivated the prison guards behavior. The State cites a number of cases involving section 1983 claims that were defeated but never applies the
 
 Johnson
 
 test to Ross’ claim, a much used standard by Second Circuit Courts. Before this claim is dismissed Ross should have the opportunity to submit affidavits to confirm the extent of the violations.
 

 SOVEREIGN IMMUNITY UNDER THE ELEVENTH AMENDMENT
 

 The Eleventh Amendment to the Constitution of the United States provides: “The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State_” It is well es
 
 *1243
 
 tablished that the Eleventh Amendment bars suit against any State as a party in a legal action.
 
 Edelman v. Jordan,
 
 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). However, a state official who deprives another of a federal right under the color of state law is not protected by the Eleventh Amendment.
 
 Ex Parte Young,
 
 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). “When an official’s actions violate the Federal Constitution, he is stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.”
 
 Id.
 
 at 159-160, 28 S.Ct. at 453-54.
 

 In this case Ross is suing individual prison officials, not the State of New York, and the Eleventh Amendment is no bar to their personal liability for their unconstitutional acts.
 
 Sckeuer v. Rhodes,
 
 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974). Defendant’s Eleventh Amendment ground for dismissing Ross’ complaint should therefore be rejected.
 

 The State argues that
 
 Jones v. Smith,
 
 784 F.2d 149, 152 (2d Cir.1986) bars Ross’ claim for damages. In
 
 Jones,
 
 an inmate claimed that his due process rights had been violated by a Superintendent Smith’s enforcement of an allegedly unconstitutional policy. The Court held the inmate’s damage claim was barred by the Eleventh Amendment since, “the deprivation suffered here was not the result of Smith’s random unauthorized acts, but rather, resulted from a policy of the state [and thus] the action against Smith is therefore brought against him in his official capacity.”
 
 Id.
 
 at 152.
 

 The facts in this case are distinguishable from
 
 Jones.
 
 Most of plaintiff’s complaints for which he seeks monetary damages are for the deprivation of food and property and the manner in which he was shaved by State officials. These complaints challenge the unconstitutional acts of prison officials who failed to follow specifically articulated State policies and not the unconstitutionality of the States directives. The arbitrary exercise of unwarranted authority alleged by the plaintiff reaches beyond the scope of a prison guard’s official duties to control the inmate population. Unlike the situation in
 
 Jones,
 
 the guards were not implementing a state policy. To the contrary they were depriving a prisoner of rights the State agreed to give him.
 

 At Downstate the officials confiscated Ross’ religious articles against the explicit regulation in DOCS Directive # 4911 which lists religious articles that an inmate may possess including: “yarmulke, tephilin, and talit katan.” Prison officials not only confiscated each of these religious articles but never returned them and continually refused to allow Ross to wear his tsitith or use his religious articles, even though Directive # 4911 so permitted. At Green Haven Ross has been allowed to have religious articles but has been forced, against State policy, to remove his tsitith before seeing visitors.
 

 Also at Downstate, Ross was deprived of an adequate diet. Directive #4202 requires that prison authorities provide religious inmates with a “nutritionally adequate diet equivalent to or exceeding” departmental nutritional requirements. Moreover, the State’s obligation to provide an adequate kosher diet is a clearly established constitutional right.
 
 Kahane v. Carlson,
 
 527 F.2d at 492. The failure to provide Ross with this diet after he expressly requested one is a seemingly purposeful violation of Directive # 4202 which was intended to remedy and prevent the very type of intrusion into religious expression which plaintiff now complains.
 

 SO ORDERED.
 

 [1]
 

 . That section provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state ... subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for
 
 *1237
 
 redress."
 
 Brandon v. Holt,
 
 469 U.S. 464, 105 S.Ct. 873, 873 n. 1, 83 L.Ed.2d 878 (1985).
 

 [2]
 

 . “Kashruth” (and the corresponding adjective “kosher”) is the system of dietary restrictions prescribed by Jewish law.
 

 [3]
 

 . A yarmulke is a skullcap and is a religious article worn by observant Jewish males.
 

 [4]
 

 . "Tephilin" are religious articles worn by observant Jewish males above the age of thirteen on the forehead and on one arm during morning prayers.
 

 [5]
 

 . "Tsitsith” is a religious garment worn by observant Jewish males at all time.