Yevgen FROMER, Plaintiff,

v.

Charles J. SCULLY, Harold J. Smith, Walter Kelly, Everett W. Jones, Thomas A. Coughlin III, and Hirshel Jaffe, Defendants.

No. 84 Civ. 5612 (CES).

United States District Court, S.D. New York.

Sept. 6, 1988.

Rosenman & Colin, New York City by Joel E. Sternman, for plaintiff.

Attorney General of the State of New York, New York City by Martha O. Shoemaker, for defendants.

MEMORANDUM DECISION

STEWART, District Judge:

Plaintiff Yevgen Fromer seeks reinstatement of this Court's January 27, 1987 judgment granting him declaratory relief and an injunction against enforcement of Directive #4914 of the New York State Department of Correctional Services ("DOCS"). *Fromer v. Scully*, 649 F.Supp. 512 (S.D.N.Y.1986), *aff'd*, 817 F.2d 227 (2d Cir.), *vacated and remanded*, —— U.S. ——, 108 S.Ct. 254, 98 L.Ed.2d 211 (1987). On October 19, 1987, the Supreme Court vacated that judgment and remanded the case for further consideration in light of *O'Lone v. Estate of Shabazz*, —— U.S. ——, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) and *Turner v. Safley*, —— U.S. ——, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). For the reasons that follow, we find on further consideration that Directive #4914 is unconstitutional as applied to Fromer, and we therefore reinstate the judgment insofar as it requires the expungement from Fromer's record of all references to violations of that Directive.

*Procedural Background*

The facts of this case are set forth in detail in this Court's November 25, 1986 opinion, *Fromer v. Scully*, 649 F.Supp. 512 (S.D.N.Y.1986), familiarity with which is assumed. Only a brief recitation of the prior proceedings is warranted here.

In August 1984, plaintiff Fromer, then an inmate in the custody of DOCS, filed a *pro se* complaint under 42 U.S.C. § 1983 alleging, *inter alia*, deprivation of his first amendment right to free exercise of religion. Following appointment of counsel, Fromer filed an amended complaint, also under 42 U.S.C. § 1983, containing nine claims. The ninth claim alleges that DOCS Directive #4914, which, among other things, requires inmates to shave or trim their beards to a length of no more than one inch, violates Fromer's right to religious freedom and is unconstitutional as

applied to him.[1] Fromer, an Orthodox Jew, claims that his religious beliefs prohibit him from shaving or trimming his facial hair. Fromer's beard claim was eventually severed from the rest of his complaint and set for trial in late 1985.[2]

After a six-day, non-jury trial, this Court found that Fromer's refusal to trim his beard was based on sincerely held religious beliefs, and that that portion of Directive # 4914 requiring inmates to trim their beards to one inch in length was unconstitutional as applied to Fromer. 649 F.Supp. at 521. During the trial, defendants offered testimony that the one-inch limit on inmates' beards was necessitated by the governmental interests in identification of inmates, control of contraband, avoidance of confrontations, fairness, and personal safety and hygiene. 649 F.Supp. at 519. In evaluating these proffered justifications, we applied the third and most stringent of the three standards of review articulated in *Wali v. Coughlin,* 754 F.2d 1015 (2d Cir. 1985).[3] We concluded that while the stated governmental interests were "unquestionably important," defendants "have not established that the beard regulation is no greater than necessary to effectuate the governmental interests involved." 649 F.Supp. at 519. We thus declared the beard length provision of Directive # 4914 unconstitutional as applied to Fromer, and enjoined defendants from shortening Fromer's beard, from ordering him to shorten it, and from punishing Fromer for refusing to shorten it. We also ordered the restoration of any good time credits and other privileges and benefits Fromer lost because of his past refusals to shorten his beard, as well as the expungement from Fromer's record of all references to disciplinary proceedings held because of violations of Directive # 4914. *Id.* at 521–22.

In an opinion dated April 24, 1987, the Second Circuit affirmed the judgment of this Court, holding that we correctly applied the third *Wali* standard of review to the facts of this case. *Fromer v. Scully,* 817 F.2d 227, 232 (2d Cir.1987). On October 19, 1987, the Supreme Court granted defendants' petition for certiorari in order to vacate the Second Circuit's judgment and remand for further consideration in light of *O'Lone v. Estate of Shabazz,* —— U.S. ——, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) and *Turner v. Safley,* —— U.S. ——, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), two cases decided the previous term which establish a uniform standard for reviewing alleged violations of prisoners' rights. In *O'Lone* and *Turner,* the Supreme Court expressly rejected *Wali's* tripartite standard of review in favor of a uniform "reasonableness" standard. *O'Lone,* 107 S.Ct. at 2404, n. **; *Turner,* 107 S.Ct. at 2261. By order dated November 24, 1987, the Second Circuit remanded the case to this Court for further consideration in accordance with the Supreme Court's mandate. 837 F.2d 1086.

### Discussion [4]

The Supreme Court in *O'Lone v. Estate of Shabazz,* 107 S.Ct. 2400 (1987) and

---

**1.** DOCS Directive # 4914 provides, in relevant part, that "[a]ll inmates may grow a beard and/or mustache not to exceed one (1) inch in length."

**2.** Fromer's first seven claims alleged, *inter alia,* failure to provide an adequate kosher diet, denial of religious services, and retaliatory transfer. By stipulation signed by this Court on April 26, 1988, Fromer voluntarily dismissed these claims. The eighth claim, which also relates to the one-inch beard restriction and may provide a basis for damages, remains viable.

**3.** *Wali* established a tripartite standard of review to evaluate prisoners' constitutional claims. First, where the right asserted is inherently inconsistent with established penological objectives, judicial deference to the judgment of prison officials should be nearly absolute. Second, where the activity sought to be engaged is presumptively dangerous, deference should be extremely broad, but not categorical. Third, where the activity sought to be engaged is not presumptively dangerous, and where the challenged restriction works a total deprivation, rather than a mere limitation, on the exercise of that right, then the restriction must be necessary to further an important governmental interest, and the limitation on freedom occasioned by the restriction must be no greater than necessary to effectuate the governmental interest involved. 754 F.2d at 1033.

**4.** On June 26, 1987, after the Second Circuit affirmed the original judgment but before the

*Turner v. Safley,* 107 S.Ct. 2254 (1987) set out to formulate a standard of review for prisoners' constitutional claims that would balance the need to protect prisoners' rights with the state's interest in pursuing valid penological objectives. *O'Lone,* 107 S.Ct. at 2404; *Turner,* 107 S.Ct. at 2259. In developing such a standard, the Court was guided by two overarching principles.

First, "prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner,* 107 S.Ct. at 2259. "Indeed, ... [the Supreme Court has] insisted that prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." *Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984). Basic first amendment rights are not among those that a prisoner sheds "at the prison gate." *Procunier v. Martinez,* 416 U.S. 396, 422, 94 S.Ct. 1800, 1815, 40 L.Ed.2d 224 (1974) (Marshall, J., concurring). Inmates clearly retain their first amendment right to freely exercise their religion. *O'Lone,* 107 S.Ct. at 2404; *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam).

Second, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Restrictions on prisoners' exercise of constitutional rights "arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone,* 107 S.Ct. at 2404 (citing *Pell v. Procunier,* 417 U.S. 817, 822–23, 94 S.Ct. 2800, 2804–05, 41 L.Ed.2d 495 (1974) and

*Procunier v. Martinez,* 416 U.S. at 412, 94 S.Ct. at 1811).

The Supreme Court in *O'Lone* and *Turner* sought to derive a uniform standard for reviewing prisoner's claims that would balance the above principles while ensuring that courts give appropriate deference to the considered judgments of prison administrators "who are actually charged with and trained in the running of the particular institution." *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979); *see O'Lone,* 107 S.Ct. at 2402; *Turner,* 107 S.Ct. 2260. After reviewing its prior decisions concerning constitutional claims by prisoners, the Court announced the following standard of review: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 107 S.Ct. at 2261; *O'Lone,* 107 S.Ct. at 2404.

In evaluating the reasonableness of a challenged regulation, *Turner* instructs reviewing courts to consider the following four factors: (1) the existence of a "valid, rational connection" between the prison regulation and the legitimate governmental interests put forward to justify it; (2) the existence of alternative means of exercising the asserted right; (3) the impact that accommodation of the asserted right will have on guards and other inmates, and on the allocation of prison resources; and (4) the existence of "ready alternatives" to accommodate the asserted right at *"de minimis"* cost to the valid penological interests. *Turner,* 107 S.Ct. at 2262.

Applying the four-factor analysis, the Court in *Turner* upheld a Missouri regulation restricting correspondence between inmates at different institutions. First, the Court found that there was a growing

Petition for Certiorari was filed with the Supreme Court, Fromer was released on parole. This fact does not render the case moot. The Supreme Court, which was informed of Fromer's parole by letter from Fromer's counsel and by Fromer's brief in opposition to the Petition, nevertheless granted certiorari, vacated the judgment, and remanded the case for reconsideration in light of *O'Lone* and *Turner.* We construe the Supreme Court's mandate as an affir-

mation that part of the relief granted by this Court—namely, the ordered expungement of disciplinary action from Fromer's record—is not mooted by Fromer's parole. *See Hewitt v. Helms,* —— U.S. ——, 107 S.Ct. 2672, 2679 n. 1, 96 L.Ed.2d 654 (1987) (Marshall, J., dissenting) ("Petitioners have offered no authority, nor can they, for the remarkable proposition that the request for expungement of respondent's record became moot upon his parole.").

problem of prison gangs which was fostered through inmate-to-inmate correspondence, and that limiting such correspondence was thus rationally related to the goal of eliminating gang activity. 107 S.Ct. at 2263. Second, the Court found that the restriction only barred communication with a specific class of individuals, and thus left open alternative means of expression. *Id.* Third, the Court found that continued exercise of the right to communicate with other inmates would have a great impact on others within the prison system insofar as such communication threatens the "core functions of prison administration, maintaining safety and internal security." *Id.* Finally, the Court found that there were no ready alternatives to the challenged regulation because the only other option, monitoring all inmate-to-inmate correspondence, would impose a tremendous burden on the system and would run the risk of missing dangerous communications. *Id.* at 2263–64.

The *Turner* Court at the same time found unconstitutional a different Missouri prison regulation that restricted the right of inmates to marry. The Court concluded that the marriage regulation was not reasonably related to the stated penological objective of avoiding potentially violent "love triangles" among inmates. It found that in prisons housing both male and female prisoners, inmate rivalries are as likely to develop without a formal marriage ceremony as with one. *Id.* at 2266. Moreover, the Court noted that the record contained no evidence that prison officials had experienced any problems with the previous policy of allowing inmate marriages. *Id.*

In *O'Lone*, the Court upheld work assignment policies adopted at a New Jersey prison which prevented certain Muslim inmates from attending Friday religious services regularly held at the main prison building. First, the Court found that the requirement that certain categories of inmates work outside the main prison facility was reasonably related to the penological objectives of easing overcrowding and thereby easing tension and drain on the facilities during the working day. 107

S.Ct. at 2405. It also found that the prison administration's policy of not allowing Muslim inmates to return to the main building for Friday services was reasonably related to the security interest in avoiding congestion and delay at the main gate, a high risk area, and to the rehabilitative interest in simulating the working conditions and responsibilities of the outside world. *Id.* at 2405–06. Second, the Court found that Muslim inmates retained the ability to participate in other Muslim religious services, including "virtually unlimited" congregations for prayer or discussion, free access to a state-provided Imam, and special arrangements for the month-long observance of Ramadan, a period of prayer and fasting. *Id.* at 2406. Third, the Court concluded that the suggested accommodations— i.e., placing all Muslims in inside work details or providing them with weekend labor —would have an adverse impact on the institution. *Id.* The extra supervision necessary to establish weekend work details would drain already scarce human resources, and the grouping together of Muslim inmates in work details would threaten prison security by allowing "affinity groups" in the prison to flourish. *Id.* By the same token, these suggested alternatives would impose more than a *de minimis* cost on valid penological interests. *Id.* The Court thus found that the work assignment policies were reasonably related to legitimate penological interests.

In the present case, Fromer challenges the one-inch beard limitation contained in DOCS Directive # 4914 as violative of his first amendment right to the free exercise of religion. As an initial matter, we note that our prior determination that Fromer, an Orthodox Jew, has a sincere, religious belief which prohibits him from trimming his beard was not challenged by defendants on appeal and remains undisturbed for purposes of the present decision. *See Fromer v. Scully*, 817 F.2d 227, 228 (2d Cir.1987), *aff'g* 649 F.Supp. 512 (S.D.N.Y.1987). We thus turn to an evaluation of the constitutionality of Directive # 4914 as applied to Fromer under the newly-announced "reasonableness" standard of *Turner* and

*O'Lone.* That is, we must determine whether the regulation is "reasonably related to legitimate penological interests." *Turner,* 107 S.Ct. at 2261; *O'Lone,* 107 S.Ct. at 2404.[5]

### 1. Valid, Rational Connection

The first *Turner* factor we consider in making this determination is whether there exists a "valid, rational connection" between the beard restriction and the governmental interests put forward to justify it. *Turner,* 107 S.Ct. at 2262. The governmental interests proffered by defendants as justifications for Directive # 4914 are the identification of inmates, control of contraband, and safety and hygiene. While defendants also put forward the governmental interests in avoidance of confrontations and fairness, these concerns are more appropriately considered in the context of the last two *Turner* factors.

#### a. *Inmate Identification*

We observed in our original decision that the "governmental interest in effective identification of inmates to insure prison security and to facilitate apprehension of escaped inmates is important and substantial." 649 F.Supp. at 519. However, we determined that limiting beards to one inch in length did not promote this interest because beards of more than one inch posed no greater security risk than beards of one inch or less. *Id.* In this regard, we credit-

ed the testimony of plaintiff's prison expert that "the change of appearance is brought about by a beard of one inch versus no beard at all, as opposed to a difference of one inch and two or three or four or longer." *Id.* at 520, quoting Tr. 428. Moreover, we noted that under Directive # 4914 inmates are free to wear their hair in any length or style, and to grow mustaches or beards in any style provided they are no longer than one inch. We wrote, "[s]ince inmates may drastically change their appearances in numerous ways while still complying with Directive # 4914, we are not persuaded that the additional disguise options of a braided or rolled beard would lead to an increase in escape attempts or in disciplinary problems within the prison." *Id.* at 520.[6]

In *Turner,* the restriction on inmate marriages was justified by the stated penological interest in avoiding potentially violent "love triangles" among inmates. 107 S.Ct. at 2266. The Supreme Court rejected this rationale, finding no evidence in the record that the marriage regulation would "prevent[ ] such entanglements." *Id.* The Court observed that "in prisons housing both male and female prisoners, inmate rivalries are as likely to develop without a formal marriage ceremony as with one." *Id.* It thus found "no logical connection" between the marriage restriction and the proffered governmental interest. *Id.* In the present case, the identification rationale is similarly undermined by the fact

---

5. We base our determination on the existing record in this case, which defendants developed with an eye to a far more stringent standard than the one we now apply. As discussed above, this Court evaluated the challenged regulation under the third and strictest *Wali* standard. *Fromer,* 649 F.Supp. at 517–18. Under this standard, which was described at the outset of the trial, Tr. 3, defendants had the burden of showing that the beard regulation was necessary to further an important governmental interest, and was the least restrictive means of doing so. It is fair to assume that defendants brought forth all available evidence in their efforts to carry this weighty burden. While they obviously did not structure their proof at trial along the lines of the four-factor analysis set forth in *Turner,* defendants' Supplemental Memorandum of Law demonstrates that the evidence they presented implicitly incorporates all of the *Turner* factors. The existing record thus

provides an ample basis for our present decision.

6. We also took note of evidence that New York City had not experienced any problems in security or identification of inmates resulting from its lack of inmate beard restrictions. *Id.,* citing Tr. 433. In both *Turner* and *O'Lone,* the Supreme Court considered practices of other prison systems relevant to an assessment of the reasonableness of the policy under challenge. *See O'Lone,* 107 S.Ct. at 2411 (practice in federal prisons of adjusting work assignments to meet inmates' religious needs required further substantiation of claim that accommodation was infeasible in state prison); *Turner,* 107 S.Ct. at 2266 (finding that Missouri marriage regulation was an "exaggerated response" in view of federal prison policy generally permitting marriage by inmates).

that identification problems are as likely to arise from long hair and varyingly styled short beards and mustaches as from beards exceeding one inch in length. *See Moskowitz v. Wilkinson,* 432 F.Supp. 947, 950 (D.Conn.1977) (Newman, J.) (need for no-beard rule undermined by current prison policy permitting hairstyles of any length as well as mustaches and sideburns). We thus find no valid, rational connection between the one-inch beard limitation and the stated governmental interest in the effective identification of inmates.

### b. *Detection of Contraband*

Defendants contend that the one-inch beard limitation is necessary to prevent inmates from concealing contraband. In our original decision, we found that contraband could be hidden "at least as easily in an inmate's long hair, clothing, or body as in his beard." 649 F.Supp. at 520. We also noted that defendants' own expert conceded that he had never heard of an instance in which contraband was concealed in an inmate's hair or beard. *Id.* Furthermore, we found that detecting contraband in long beards could be achieved by the search procedures currently in effect. *Id.*

These same findings, which defendants have offered no basis for repudiating, lead us to the conclusion that the beard regulation is an arbitrary response to the indisputably serious problem of contraband in prisons. Given the numerous ways in which drugs and weapons can be hidden by inmates, the absence of any evidence that prisoners ever actually conceal contraband in their beards undermines defendants' claim that the beard restriction furthers their interest in detecting contraband. *See Monroe v. Bombard,* 422 F.Supp. 211, 217 (S.D.N.Y.1976) (particularly since no contraband was ever found in an inmate's beard, "it seems frivolous to suggest that beards are likely hiding places for contraband where inmates are permitted to wear three-inch Afro haircuts"); *cf. Jackson v. Elrod,* 671 F.Supp. 1508 (N.D.Ill.1987) (finding unconstitutional a prison ban on hardcover books where defendants cited no incidents in which hardcover books were used in manner posing a security risk).

*Turner* requires that courts evaluate the relationship between the challenged regulation and the articulated penological objective by reference to the evidentiary record in each case. *Turner,* 107 S.Ct. at 2266. The record in this case lends no support to defendants' claim that the beard restriction bears a rational relationship to the goal of detecting contraband.

### c. *Safety and Hygiene*

Defendants claim that an untrimmed beard can get caught in machinery and can pose a hygiene problem in the case of inmates assigned to the food service or if beards become infested with vermin. Again, we found in our original opinion, and continue to find here, that the situation presented by long beards is indistinguishable from that presented by long hair. Defendants' prohibition of the former represents an arbitrary and irrational response to perceived problems easily remedied in other ways. For example, we determined that requiring beard guards to be worn around machinery and food preparation areas would readily eliminate any risk of danger, and that the same hygiene practices currently followed in the case of long hair can be extended to long beards. 649 F.Supp. at 521.

### 2. Alternative Means of Exercising Right

The second *Turner* factor we must consider is whether there are alternative means of exercising the asserted right that remain open to inmates. *Turner,* 107 S.Ct. at 2262. In deciding which of the three *Wali v. Coughlin, supra,* standards of review to apply to this case, we held in our original decision that "requiring Fromer to cut his facial hair would work a total deprivation of his religious belief that the beard must not be disturbed." 649 F.Supp. at 518; *see Fromer v. Scully,* 817 F.2d at 232 (expressly affirming finding of total deprivation); *see also Ross v. Coughlin,* 669 F.Supp. 1235, 1240 (S.D.N.Y.1987) (post-*Turner* decision finding that identical beard regulation worked a total deprivation of asserted right). Defendants argue that, under the Supreme Court's recent holdings,

because Fromer could engage in other forms of religious observation—such as keeping a kosher diet, participating in religious services, or wearing a yarmulke—the one-inch beard limitation did not amount to a total deprivation of his asserted right. We cannot agree.

The Supreme Court in *Turner* emphasized that the challenged ban on inmate-to-inmate correspondence did not deprive inmates of "all means of expression," but rather prohibited communication "only with a limited class of other people with whom prison officials have particular cause to be concerned." 107 S.Ct. at 2263. *Cf. Rodriguez v. James*, 823 F.2d 8, 12 (2d Cir.1987) (inspecting inmates' business letters to prevent fraud has even less impact on inmates' exercise of first amendment rights than rule upheld in *Turner*). The Court in *O'Lone*, while acknowledging the importance of the Friday Jumu'ah service to the Muslim inmates, focused on whether the inmates deprived of their ability to participate in Jumu'ah nevertheless "retain[ed] the ability to participate in other Muslim religious ceremonies." 107 S.Ct. at 2406. Observing that the Muslim inmates retained a "virtually unlimited" right to congregate for prayer and discussion, had free access to a state-provided Imam, and received special accommodations to engage in month-long observance of Ramadan, the Court concluded that ample alternative means existed for the inmates to exercise their asserted right. *Id.* In the present case, compliance with Directive # 4914 would have completely deprived Fromer of his right to grow his beard in accordance with his religious beliefs. Unlike the inmates in *Turner*, who remained free to correspond with anyone other than inmates at other institutions, or those in *O'Lone*, who retained "virtually unlimited" opportunities for prayer, Fromer had no alternative means of exercising this right.

Defendants' argument that the availability of other forms of religious practice is sufficient to uphold the regulation at issue would render the second *Turner* factor meaningless. Insofar as the state can never deprive an inmate of his ability to engage in solitary, meditative religious conduct, there will always be at least some form of religious practice available to every inmate, no matter how many other practices are proscribed. Taken to its logical extreme, defendants' argument would uphold a total ban on a prisoner's outward manifestations of his religious beliefs since he would necessarily retain the ability to pray silently and alone. Contrary to defendants' suggestion that religious practices are fungible commodities, Fromer's ability to wear a yarmulke in prison does not mitigate the total deprivation of his right to leave his beard untouched. *See Sample v. Borg*, 675 F.Supp. 574, 580 (E.D.Cal.1987).

### 3. Impact of Accommodation

The third factor to be considered is the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 107 S.Ct. at 2262. Defendants contend that accommodating the right to grow long beards by means of the suggested alternatives of serial photographs and periodic beard searches would significantly impact on both the allocation of prison resources and on the potential for confrontation between inmates and corrections officers. They also assert that accommodation could lead to perceptions of favoritism and unfairness among the other inmates. We reject these arguments.

We found in our original opinion that Fromer's rights could have been accommodated and defendants' asserted penological concerns met using methods already in effect in the prisons. For example, identification of inmates could be promoted by rephotographing the inmate whenever the growth of his beard significantly changes his appearance. *See* 649 F.Supp. at 520. Directive # 4914 already requires a clean-shaven photograph of every inmate upon entry to the prison system. Directive # 4914 further provides that an inmate can be rephotographed at his own expense "[i]f, in the opinion of the Correction Officer or Supervisor, an inmate drastically changes his appearance by changing the length of his hair or growing or shaving a

beard and/or mustache." Such serial photographs are currently used for inmates who grow their hair long and, particularly since Directive # 4914 provides that rephotographing be done at the inmates' own expense, would impose no additional burden on prison resources.[7] *See Monmouth County Correctional Institution Inmates v. Lanzaro,* 834 F.2d 326, 341 (3d Cir.1987) (accommodating prisoners' right to nontherapeutic abortion imposes no greater burden than already exists in providing pregnant inmates with necessary pre-and post-natal care), *cert. denied,* —— U.S. ——, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988).

Similarly, we found that defendants' concern about concealment of contraband in beards can be alleviated using the very search procedures already employed in connection with long hair. *Id.* at 521. Inmates are currently searched periodically with metal detectors. In addition, prisoners are presently required to run their fingers through their hair and beards during contraband searches, and corrections officers are permitted to search hair and beards if they suspect something is still concealed. These methods will be no less effective, and no more time consuming, where the long hair is on the prisoner's face rather than on his scalp.

Defendants argue, however, that the rephotographing and physical searches necessitated by long beards would increase opportunities for confrontation between inmates and guards. Again, defendants' argument is undermined by the fact that these methods are currently used for prisoners who choose to grow long hair. The possibility of confrontation is no greater for inmates with long beards than for inmates with long hair. Moreover, while no statistics have been provided regarding the number of Orthodox Jews in state-run prisons whose sincerely held beliefs compel them to grow long beards, it is highly unlikely that accommodating Fromer would have opened any floodgates.

Defendants further argue that allowing exceptions to the uniform one-inch beard regulation might promote perceptions of unfairness and resentment among the other inmates. As we noted in our original opinion, this argument is belied by the fact that numerous DOCS directives already provide exemptions for inmates with sincerely held religious beliefs. 649 F.Supp. at 521. For example, American Indians are exempted during religious ceremonies from the requirement that they tie their long hair back in a ponytail, other religious groups are permitted to observe dietary requirements and restrictions on activity on their Sabbath, and many inmates are permitted to wear various religious items. *Id.* Plaintiff's expert testified at the trial that inmates do not resent exemptions for other inmates based on sincere religious belief as long as the exemptions are based on a uniform rule and all inmates have an opportunity to demonstrate their special religious needs. *Id.,* citing Tr. 432. Accordingly we perceive no "significant 'ripple effect' on fellow inmates or on prison staff," *Turner,* 107 S.Ct. at 2262, that would be caused by accommodating Fromer's right to grow his beard in accordance with his religious beliefs.

The impact of accommodating the rights asserted in *Turner* and *O'Lone* would have been far greater than any conceivable impact that might have resulted from accommodating Fromer's rights. In *Turner,* the Supreme Court stated that permitting correspondence between inmates at different institutions would "facilitate[ ] the development of informal organizations that threaten the core functions of prison administration, maintaining safety and internal security," and would have a potentially broad "ripple effect" on the inmates and staff of more than one institution. *Turner,* 107 S.Ct. at 2254. In *O'Lone,* the Court found

---

**7.** Defendants contend that rephotographing is not a viable alternative to Directive # 4914 because multiple photographs "could not be distributed to law enforcement authorities, or posted for the public, quickly enough after an escape to be useful." Defendants' Supplemental Memorandum of Law at 43–44. Defendants do not explain why it takes longer to distribute multiple photographs than to distribute a single photograph, or why rephotographing for beard length affects the distribution of photographs any more than rephotographing for hair length.

that allowing the Muslim inmates who held outside work assignments to return to the main facility for Jumu'ah services would require additional security guards and special transportation, while the suggested alternatives posed substantial security risks and unacceptable administrative burdens. *O'Lone,* 107 S.Ct. at 2406. *Cf. Matiyn v. Henderson,* 841 F.2d 31, 37 (2d Cir.) (disciplinary confinement in Special Housing Unit which prevented inmate from attending congregate services was reasonably related to legitimate penological objectives), *cert. denied,* — U.S. —, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988). As discussed above, accommodating Fromer's right to an untrimmed beard would have created no burdens beyond those which defendants have already willingly assumed in connection with long hair, and would have had no "ripple effect" on fellow inmates or prison staff.

4. The Existence of Ready Alternatives

The fourth *Turner* factor is the existence of an "alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." 107 S.Ct. at 2262. *Turner* teaches us that "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* at 2263. As our discussion in the preceding section makes clear, prison administrators not only had "easy alternatives" to a total deprivation of the asserted constitutional right, they had alternatives that were already in use in the prisons. Rephotographing inmates at their own expense and searching their beards for contraband would impose no additional cost on defendants.

Yet despite the ready availability of these alternatives, defendants insist that accommodation would nevertheless inhibit the recapture of escaped inmates, make it more difficult to detect dangerous contraband, and increase the likelihood of confrontations between guards and inmates. But these alleged costs, to the extent they may exist, are no greater than those defendants have already willingly assumed by allowing inmates to grow long hair.

Given this fact, and given the ready availability of alternatives to total deprivation, we find that the one-inch beard limitation represents an "exaggerated response" to defendants' concerns, and fails to satisfy the reasonable relationship standard announced in *Turner* and *O'Lone.*

### Conclusion

The one-inch beard limitation contained in DOCS Directive # 4914 is not reasonably related to legitimate penological interests and is unconstitutional as applied to Fromer. The judgment entered in favor of Fromer on January 27, 1987 is therefore reinstated insofar as it requires expungement from Fromer's disciplinary record of all references to violations of Directive # 4914.

Fromer is awarded reasonable attorneys' fees pursuant to 42 U.S.C. § 1988. Fromer shall submit, within twenty days of entry of this Order, an updated statement of services rendered and disbursements incurred since March 31, 1988, the last date covered by the previous such statement. Defendants shall submit any objections they may have to Fromer's fee application no later than sixty days thereafter.

SO ORDERED.